## JODEE VIERA ET AL. *v.* IAN COHEN ET AL.
### (SC 17478)

Borden, Norcott, Katz, Palmer and Zarella, Js.

Argued November 21, 2006—officially released August 7, 2007

*Frank H. Santoro,* with whom were *Regina Duchin Kraus* and, on the brief, *Calum B. Anderson,* for the appellant (defendant Thomas McNamee).

*Carey B. Reilly,* with whom were *Joshua D. Koskoff* and, on the brief, *Neil DeYoung* and *Lillian Gustilo,* for the appellee (plaintiff).

*Cesar A. Noble* filed a brief for the Connecticut Defense Lawyers Association as amicus curiae.

*Opinion*

KATZ, J. In this medical malpractice action, the defendant Thomas McNamee appeals from the judgment of the trial court, rendered after a jury trial, in favor of the plaintiff, Fred Baker, guardian of the estate of the injured minor, Jodee Viera (Jodee).[1] Although the defen-

---

[1] As explained further in this opinion, the original plaintiffs to this action, Jodee's parents, Leslie Aponte and Joseph Viera, initially had brought suit against Thomas McNamee and three other defendants, but shortly before trial withdrew their claims against those defendants. Accordingly, for purposes of this appeal, we refer to McNamee as the defendant. Aponte and Joseph Viera had brought the action both as representatives of Jodee's interests and in their individual capacities. Thereafter, Aponte and Joseph Viera withdrew the claims brought in their individual capacities and substituted Baker to represent Jodee's interests. Accordingly, we refer to Baker as the plaintiff and to Jodee by name.

dant raises numerous claims of trial improprieties, his principal claim is that the trial court improperly precluded him from pursuing an apportionment complaint against another party against whom the plaintiff had withdrawn his case shortly before trial commenced. Specifically, we must consider whether a plaintiff's withdrawal of claims against a party, without payment of a settlement or other consideration, constitutes a "release, settlement or similar agreement" for purposes of apportionment under General Statutes § 52-572h (n).[2]

[2] General Statutes § 52-572h provides in relevant part: "(b) In causes of action based on negligence, contributory negligence shall not bar recovery in an action by any person or the person's legal representative to recover damages resulting from personal injury, wrongful death or damage to property if the negligence was not greater than the combined negligence of the person or persons against whom recovery is sought including settled or released persons under subsection (n) of this section. The economic or noneconomic damages allowed shall be diminished in the proportion of the percentage of negligence attributable to the person recovering which percentage shall be determined pursuant to subsection (f) of this section.

"(c) In a negligence action to recover damages resulting from personal injury, wrongful death or damage to property occurring on or after October 1, 1987, if the damages are determined to be proximately caused by the negligence of more than one party, each party against whom recovery is allowed shall be liable to the claimant only for such party's proportionate share of the recoverable economic damages and the recoverable noneconomic damages except as provided in subsection (g) of this section.

"(d) The proportionate share of damages for which each party is liable is calculated by multiplying the recoverable economic damages and the recoverable noneconomic damages by a fraction in which the numerator is the party's percentage of negligence, which percentage shall be determined pursuant to subsection (f) of this section, and the denominator is the total of the percentages of negligence, which percentages shall be determined pursuant to subsection (f) of this section, to be attributable to all parties whose negligent actions were a proximate cause of the injury, death or damage to property including settled or released persons under subsection (n) of this section. Any percentage of negligence attributable to the claimant shall not be included in the denominator of the fraction.

"(e) In any action to which this section is applicable, the instructions to the jury given by the court shall include an explanation of the effect on awards and liabilities of the percentage of negligence found by the jury to be attributable to each party.

"(f) The jury or, if there is no jury, the court shall specify: (1) The amount of economic damages; (2) the amount of noneconomic damages; (3) any

## We conclude that a withdrawal does not constitute such

findings of fact necessary for the court to specify recoverable economic damages and recoverable noneconomic damages; (4) the percentage of negligence that proximately caused the injury, death or damage to property in relation to one hundred per cent, that is attributable to each party whose negligent actions were a proximate cause of the injury, death or damage to property including settled or released persons under subsection (n) of this section; and (5) the percentage of such negligence attributable to the claimant.

"(g) (1) Upon motion by the claimant to open the judgment filed, after good faith efforts by the claimant to collect from a liable defendant, not later than one year after judgment becomes final through lapse of time or through exhaustion of appeal, whichever occurs later, the court shall determine whether all or part of a defendant's proportionate share of the recoverable economic damages and recoverable noneconomic damages is uncollectible from that party, and shall reallocate such uncollectible amount among the other defendants in accordance with the provisions of this subsection. (2) The court shall order that the portion of such uncollectible amount which represents recoverable noneconomic damages be reallocated among the other defendants according to their percentages of negligence, provided that the court shall not reallocate to any such defendant an amount greater than that defendant's percentage of negligence multiplied by such uncollectible amount. (3) The court shall order that the portion of such uncollectible amount which represents recoverable economic damages be reallocated among the other defendants. The court shall reallocate to any such other defendant an amount equal to such uncollectible amount of recoverable economic damages multiplied by a fraction in which the numerator is such defendant's percentage of negligence and the denominator is the total of the percentages of negligence of all defendants, excluding any defendant whose liability is being reallocated. (4) The defendant whose liability is reallocated is nonetheless subject to contribution pursuant to subsection (h) of this section and to any continuing liability to the claimant on the judgment.

"(h) (1) A right of contribution exists in parties who, pursuant to subsection (g) of this section are required to pay more than their proportionate share of such judgment. The total recovery by a party seeking contribution shall be limited to the amount paid by such party in excess of such party's proportionate share of such judgment.

"(2) An action for contribution shall be brought within two years after the party seeking contribution has made the final payment in excess of such party's proportionate share of the claim. . . .

"(n) A release, settlement or similar agreement entered into by a claimant and a person discharges that person from all liability for contribution, but it does not discharge any other persons liable upon the same claim unless it so provides. However, the total award of damages is reduced by the amount of the released person's percentage of negligence determined in accordance with subsection (f) of this section. . . ."

an agreement, and we reject the defendant's remaining claims. Accordingly, we affirm the judgment of the trial court.

The record reveals the following undisputed facts and procedural history. The defendant is an obstetrician working with the practice group of Associated Women's Health Specialists, P.C. (Associated Health). The defendant attended to Jodee's mother, Leslie Aponte, during Aponte's pregnancy beginning in November, 1994, and through May, 1995, and during the early stages of her labor on May 25, 1995, at Waterbury Hospital. The defendant left during the second stage of Aponte's labor and thereafter was unavailable. Ian Cohen, another obstetrician affiliated with Associated Health, attended to Aponte during the final stages of labor and delivery. During that delivery, an obstetrical emergency occurred, known as shoulder dystocia, wherein the infant's head delivers, but partly retracts because the baby's shoulders become lodged, requiring delivery of the child within minutes to avoid risk of neurological injury or death. See generally T. Stedman, Medical Dictionary (28th Ed. 2006) p. 602. As a result of the shoulder dystocia during her birth, Jodee sustained an injury to her brachial plexis, a network of nerves in the neck, leaving her with a permanent injury affecting her upper left extremities.

On August 22, 1997, Aponte and Joseph Viera, Jodee's father, commenced this medical malpractice action against the defendant, Cohen, Associated Health and Waterbury Hospital. In November, 2003, they withdrew the claim against Waterbury Hospital. In December, 2003, Baker was substituted as the plaintiff to represent Jodee's interests.

We note that No. 99-69 of the 1999 Public Acts added subsection (o) to § 52-572h and made technical changes for purposes of gender neutrality. For purposes of clarity and convenience, we refer herein to the current revision of the statute.

On December 16, 2004, during jury selection, the plaintiff withdrew the claims against Cohen and Associated Health. On January 20, 2005, the defendant filed a notice of claim of apportionment as to the withdrawn defendants, Cohen, Associated Health and Waterbury Hospital. In response, the plaintiff filed a motion in limine seeking to preclude the defendant from introducing, inter alia, any evidence for the purposes of establishing fault against the withdrawn defendants. After argument on the motion, the trial court rendered an oral decision granting the plaintiff's motion, thereby foreclosing the defendant from seeking apportionment.

Thereafter, the plaintiff filed an amended complaint alleging, in essence, that the defendant had breached the standard of care by failing: to assess properly Aponte's risk factors for shoulder dystocia; to diagnose timely the problems during Aponte's labor that indicated a risk of shoulder dystocia; and, finally, to perform a cesarean section to prevent the injuries ensuing from shoulder dystocia. The jury rendered a verdict in favor of the plaintiff, and awarded $948,692 in economic damages and $1.5 million in noneconomic damages. The court denied the defendant's motion to set aside the verdict and thereafter rendered judgment in accordance with the verdict. This appeal followed.[3]

The defendant claims that the trial court improperly: (1) prevented him from pursuing an apportionment complaint against Cohen; (2) prevented the jury from considering an alternative theory as to the cause of the shoulder dystocia; (3) submitted to the jury misleading and improper interrogatories; and (4) concluded that it had personal jurisdiction over the defendant. The defendant also claims that certain evidentiary rulings

---

[3] The defendant appealed from the trial court's judgment to the Appellate Court, and we thereafter transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-2.

by the trial court and conduct by the plaintiff's counsel resulted in undue prejudice to him. We reject each of these claims.

I

The defendant claims that he was entitled to seek apportionment pursuant to § 52-572h (n), which provides in relevant part that, although "[a] release, settlement or similar agreement entered into by a claimant . . . discharges that person from all liability for contribution . . . the total award of damages is reduced by the amount of the released person's percentage of negligence determined in accordance with subsection (f) of this section." Specifically, the defendant contends that the trial court improperly precluded him from seeking apportionment of liability between himself and Cohen based on its determination that, because the plaintiff had withdrawn the action against Cohen without payment of a settlement, there was no "release, settlement or similar agreement" that brought Cohen within the scope of § 52-572h.[4] We conclude that the trial court properly concluded that the defendant could not seek apportionment against Cohen.

At the outset, we note that, "[b]ecause statutory interpretation is a question of law, our review is de novo." *Andover Ltd. Partnership I* v. *Board of Tax Review*, 232 Conn. 392, 396, 655 A.2d 759 (1995). Well settled

---

[4] In the middle of the section of the defendant's brief to this court challenging the apportionment ruling, the defendant also asserts that the trial court's ruling precluding apportionment "was exacerbated by its causation instructions" and "was aggravated by its rulings on other matters relating to the universe of tortfeasors." Given the placement of these assertions in the defendant's brief, the absence of the requisite discussion of the standard of review to be applied to such claims and the treatment of these claims merely as they relate to exacerbating or aggravating the harm stemming from the failure to allow apportionment, we do not treat these contentions as separate claims on appeal. Rather, we assume that they are intended to illustrate the prejudice inuring to the defendant as a result of the trial court's allegedly improper ruling on apportionment.

principles of statutory interpretation govern our review. General Statutes § 1-2z provides: "The meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered." When the relevant statutory text and the relationship of that text to other statutes do not reveal a meaning that is plain and unambiguous, our analysis is not limited, and we look to other factors relevant to determining the meaning of § 52-272h (n), including its legislative history, the circumstances surrounding its enactment and its purpose. *Nine State Street, LLC* v. *Planning & Zoning Commission*, 270 Conn. 42, 46, 850 A.2d 1032 (2004). "The test to determine ambiguity is whether the statute, when read in context, is susceptible to more than one reasonable interpretation." (Internal quotation marks omitted.) *Tarnowsky* v. *Socci*, 271 Conn. 284, 287 n.3, 856 A.2d 408 (2004).

We begin our analysis with a brief review of the evolution of tort law in this state regarding the apportionment of damages among multiple tortfeasors. "Prior to October 1, 1986, this state followed the rules of joint and several liability with no contribution among joint tortfeasors. Stated briefly: If the illegal conduct of each of the defendants was a proximate cause of the collision, they would be liable jointly and severally, the plaintiff would have a right to recover the entire amount of damages awarded from either, and, if he did so, the defendant paying them would have no right of contribution against the other; or the plaintiff might have sued either alone, and of course in the event of a recovery, that one would have been compelled to pay the entire

amount of damages. . . . *Donner* v. *Kearse*, 234 Conn. 660, 666, 662 A.2d 1269 (1995).

"Under the common law of joint and several liability, therefore, even a defendant whose degree of fault was comparatively small could be held responsible for the entire amount of damages, so long as his negligence was a proximate cause of the plaintiff's injuries. Thus, the plaintiff could collect the entire amount of his judgment from the richest defendant, or from the defendant with the deepest pocket. . . . Id., 667.

"In response largely to these concerns, the legislature undertook to reform the tort recovery provisions of our civil system, by enacting No. 86-338 of the 1986 Public Acts (Tort Reform I), which took effect October 1, 1986. Tort Reform I replaced the common-law rule of joint and several liability with a system of apportioned liability, holding each defendant liable for only his or her proportionate share of damages. Specifically, § 3 (f) of Tort Reform I provided that each defendant initially would be liable for only that percentage of his negligence that proximately caused the injury, in relation to [100] per cent, that is attributable to each person whose negligent actions were a proximate cause of the damages . . . . Therefore, under Tort Reform I, the jury, in determining the percentage of negligence attributable to any defendant, could take into account the negligence of any other person, regardless of whether that person was a party to the action. Tort Reform I, however, did not provide the plaintiff with a means of securing payment of damages unless that person was also a party. *Donner* v. *Kearse*, supra, 234 Conn. 667.

"Under Tort Reform I, to avoid the possibility that a jury would find that the negligence of a nonparty was a proximate cause of [the plaintiff's] injuries, [the] plaintiff was required to name as defendants all persons whose actions suggested even the slightest hint of negli-

gence. The unwanted practical effect, therefore, was that plaintiffs were required to pursue claims of weak liability against third parties, thereby fostering marginal and costly litigation in our courts. . . .

"The legislature amended these tort recovery provisions just one year later when it enacted No. 87-227 of the 1987 Public Acts (Tort Reform II), the pertinent provisions of which now are codified in part under § 52-572h. These revisions, which took effect October 1, 1987, altered the class of individuals to whom the jury could look in determining whose negligence had been a proximate cause of a plaintiff's injuries. In short, these revisions changed the focus of this class of negligent individuals from any person to any party and certain other identifiable persons. See General Statutes § 52-572h (c), (d), (f) [and] (n). Thus, while Tort Reform I provided that the jury, in determining the percentage of responsibility of a particular defendant, could also consider the entire universe of negligent persons, Tort Reform II limited this universe to only those individuals who were parties to the legal action or who were specifically identified in § 52-572h (n). . . . *Eskin* v. *Castiglia*, 253 Conn. 516, 525–26, 753 A.2d 927 (2000). Thus, the provisions set forth in § 52-572h establish two classes of persons whose negligence must be considered by the trier of fact: (1) the parties to the action; and (2) settled or released persons, as the term is defined in subsection (n)." (Internal quotation marks omitted.) *Collins* v. *Colonial Penn Ins. Co.*, 257 Conn. 718, 729–31, 778 A.2d 899 (2001).

In sum, in substantially revising and rewriting § 52-572h, the legislature: limited the persons to whom percentages of negligence could be attributed; required the jury or court to specify any findings of fact necessary for the court to articulate recoverable economic damages and recoverable noneconomic damages; and revised the method of reallocating an uncollectible

amount of damages so that all recoverable economic damages would be reallocated among the other defendants and would compensate the claimant fully for such recoverable economic damages. See *Donner* v. *Kearse,* supra, 234 Conn. 666–70.

Nonetheless, "Tort Reform II overlooked [certain] significant details required to implement effectively the newly created fault apportionment system. . . . Among other things, Tort Reform II did not specify the procedure to be used in asserting an apportionment claim. . . . To remedy this and other problems, the legislature, in 1995, enacted [General Statutes] § 52-102b,[5] which delineates the manner in which apportion-

---

[5] General Statutes § 52-102b provides: "(a) A defendant in any civil action to which section 52-572h applies may serve a writ, summons and complaint upon a person not a party to the action who is or may be liable pursuant to said section for a proportionate share of the plaintiff's damages in which case the demand for relief shall seek an apportionment of liability. Any such writ, summons and complaint, hereinafter called the apportionment complaint, shall be served within one hundred twenty days of the return date specified in the plaintiff's original complaint. The defendant filing an apportionment complaint shall serve a copy of such apportionment complaint on all parties to the original action in accordance with the rules of practice of the Superior Court on or before the return date specified in the apportionment complaint. The person upon whom the apportionment complaint is served, hereinafter called the apportionment defendant, shall be a party for all purposes, including all purposes under section 52-572h.

"(b) The apportionment complaint shall be equivalent in all respects to an original writ, summons and complaint, except that it shall include the docket number assigned to the original action and no new entry fee shall be imposed. The apportionment defendant shall have available to him all remedies available to an original defendant including the right to assert defenses, set-offs or counterclaims against any party. If the apportionment complaint is served within the time period specified in subsection (a) of this section, no statute of limitation or repose shall be a defense or bar to such claim for apportionment, except that, if the action against the defendant who instituted the apportionment complaint pursuant to subsection (a) of this section is subject to such a defense or bar, the apportionment defendant may plead such a defense or bar to any claim brought by the plaintiff directly against the apportionment defendant pursuant to subsection (d) of this section.

"(c) No person who is immune from liability shall be made an apportionment defendant nor shall such person's liability be considered for apportion-

ment claims under § 52-572h are to be brought. See Public Acts 1995, No. 95-111, § 1. . . . [Section] 52-102b (c) sets forth the notice that is required when a defendant asserts an apportionment claim against a nonparty to the action who has settled with the plaintiff or who has been released from the plaintiff's claims." (Citations omitted; internal quotation marks omitted.) *Carlson* v. *Waterbury Hospital*, 280 Conn. 125, 142, 905 A.2d 654 (2006).

Against this legislative landscape, we must now examine what constitutes "[a] release, settlement or

ment purposes pursuant to section 52-572h. If a defendant claims that the negligence of any person, who was not made a party to the action, was a proximate cause of the plaintiff's injuries or damage and the plaintiff has previously settled or released the plaintiff's claims against such person, then a defendant may cause such person's liability to be apportioned by filing a notice specifically identifying such person by name and last known address and the fact that the plaintiff's claims against such person have been settled or released. Such notice shall also set forth the factual basis of the defendant's claim that the negligence of such person was a proximate cause of the plaintiff's injuries or damages. No such notice shall be required if such person with whom the plaintiff settled or whom the plaintiff released was previously a party to the action.

"(d) Notwithstanding any applicable statute of limitation or repose, the plaintiff may, within sixty days of the return date of the apportionment complaint served pursuant to subsection (a) of this section, assert any claim against the apportionment defendant arising out of the transaction or occurrence that is the subject matter of the original complaint.

"(e) When a counterclaim is asserted against a plaintiff, he may cause a person not a party to the action to be brought in as an apportionment defendant under circumstances which under this section would entitle a defendant to do so.

"(f) This section shall be the exclusive means by which a defendant may add a person who is or may be liable pursuant to section 52-572h for a proportionate share of the plaintiff's damages as a party to the action.

"(g) In no event shall any proportionate share of negligence determined pursuant to subsection (f) of section 52-572h attributable to an apportionment defendant against whom the plaintiff did not assert a claim be reallocated under subsection (g) of said section. Such proportionate share of negligence shall, however, be included in or added to the combined negligence of the person or persons against whom the plaintiff seeks recovery, including persons with whom the plaintiff settled or whom the plaintiff released under subsection (n) of section 52-572h, when comparing any

similar agreement entered into by a claimant" pursuant to § 52-572h (n). Specifically, the present case requires that we consider whether, pursuant to the apportionment scheme under §§ 52-572h and 52-102b; see footnotes 2 and 5 of this opinion; the court should have permitted the defendant to seek apportionment of liability between himself and Cohen, when the plaintiff's action against Cohen had been withdrawn, and he thus no longer was a party to the action. The defendant acknowledges that the term "withdrawal" is not provided for expressly in § 52-572h, but contends that it nonetheless should be included within the statute based on two theories. The first theory is that, to further the statutory goal of proportionality, the terms "release" and "settlement" in § 52-572h (n) must be read broadly to include the withdrawal of an action. The defendant's second theory is that, even if it is not included under a broad reading of "release" and "settlement," a withdrawal constitutes a "similar agreement" within the meaning of subsection (n) in light of what he deems the legislature's "desire to apply the statutory scheme without regard to terminological exactitude over the circumstances under which a defendant exits the case and without necessarily referring to a particular type of document or settlement money." We disagree.

In addressing the defendant's claims, we are mindful that § 52-572h abrogated the common-law rule of joint and several liability. "[W]hen a statute is in derogation of common law . . . it should receive a strict construction and is not to be extended, modified, repealed or enlarged in its scope by the mechanics of [statutory] construction. . . . In determining whether or not a statute abrogates or modifies a common law rule the construction must be strict, and the operation of a statute in derogation of the common law is to be limited

---

negligence of the plaintiff to other parties and persons under subsection (b) of said section."

to matters clearly brought within its scope. . . . Although the legislature may eliminate a common law right by statute, the presumption that the legislature does not have such a purpose can be overcome only if the legislative intent is clearly and plainly expressed. . . . The rule that statutes in derogation of the common law are strictly construed can be seen to serve the same policy of continuity and stability in the legal system as the doctrine of stare decisis in relation to case law." (Internal quotation marks omitted.) *Matthiessen* v. *Vanech*, 266 Conn. 822, 838–39, 836 A.2d 394 (2003), quoting *Alvarez* v. *New Haven Register, Inc.*, 249 Conn. 709, 715, 735 A.2d 306 (1999). Accordingly, we conduct our inquiry through this narrow lens.

A

To address the defendant's first contention, we begin with the terms "settlement" and "release." Both of these terms have well established meanings. "A settlement is a legally enforceable agreement in which a claimant agrees not to seek recovery outside the agreement for specified injuries or claims from some or all of the persons who might be liable for those injuries or claims." Restatement (Third), Torts, Apportionment of Liability § 24 (a) (2000). It is well established that, to be a legally enforceable agreement, a settlement must be supported by consideration. See, e.g., *Warner* v. *Warner*, 124 Conn. 625, 630–32, 1 A.2d 911 (1938); *Church* v. *Spicer*, 85 Conn. 579, 582–83, 83 A. 1115 (1912). Its goal is to further finality and to avoid the costs and uncertainties of protracted litigation.

A release is an agreement to give up or discharge a claim. *Gionfriddo* v. *Gartenhaus Cafe*, 211 Conn. 67, 73–74 n.8, 557 A.2d 540 (1989); *Ramsay* v. *Camrac, Inc.*, 96 Conn. App. 190, 200, 899 A.2d 727, cert. denied, 280 Conn. 910, 908 A.2d 538 (2006). It "terminates litigation or a dispute and [is] meant to be a final expression

of settlement . . . ." 66 Am. Jur. 2d 370–71, Release § 1 (2001). A release acts like a contract and, as with any contract, requires consideration, voluntariness and contractual capacity. See id., §§ 47 through 51, pp. 416–20; see also *Dwy* v. *Connecticut Co.*, 89 Conn. 74, 77–79, 92 A. 883 (1915) ("It is an ancient and familiar legal proposition that a release or discharge of one or more of several joint tort-feasors, *given for a consideration*, is a release of all. . . . [I]t has been said that the reason is that the law considers that the one who has received the release committed the whole tort and occasioned the whole injury, and that it has satisfied the injured party." [Citations omitted; emphasis added.]). In other words, the document ensures the released tortfeasor that he has bought his peace.

Accordingly, "[r]eleases and settlements . . . represent a surrender of a cause of action, perhaps for a consideration less than the injury received";[6] *Gion-*

---

[6] There is considerable precedent of this court recognizing that a settlement and release must be supported by consideration. See *Ross* v. *Koenig*, 129 Conn. 403, 406–407, 28 A.2d 875 (1942) ("The compromise and release of doubtful claims for personal injury is highly favored by the law, and any contract by which there is a fair meeting of the minds of the parties to that end must be adopted by the courts. If there was a meeting of the minds of the parties, without fraud or unfair conduct on either side, the contract must stand, although subsequent events may show that either party made a bad bargain, because of a wrong estimate of the damages which would accrue. If the consideration be found grossly inadequate, however, it could have a bearing upon the question whether the release was obtained by fraud." [Internal quotation marks omitted.]); see also, e.g., *Cogan* v. *Chase Manhattan Auto Financial Corp.*, 276 Conn. 1, 11, 882 A.2d 597 (2005); *PSE Consulting, Inc.* v. *Frank Mercede & Sons, Inc.*, 267 Conn. 279, 311, 838 A.2d 135 (2004); *Macomber* v. *Travelers Property & Casualty Corp.*, 261 Conn. 620, 632–33, 804 A.2d 180 (2002); *Cunha* v. *Colon*, 260 Conn. 15, 17–18, 792 A.2d 832 (2002); *Bovat* v. *Waterbury*, 258 Conn. 574, 595, 783 A.2d 1001 (2001); *Alvarez* v. *New Haven Register, Inc.*, supra, 249 Conn. 711–12 n.4. In rejecting the defendant's position, the trial court relied, in part, on the notion that there must be a payment of settlement in order to trigger the right to apportionment under § 52-572h (n). We disagree with that narrow interpretation of consideration, but conclude, however, that, in light of the lack of any form of consideration under the broadest meaning of that term in the present case; see part I C of this opinion; even if we were to conclude

*friddo* v. *Gartenhaus Cafe*, supra, 211 Conn. 73–74 n.8; but, nevertheless, a surrender pursuant to an agreement. See, e.g., General Statutes § 52-195c (a). An "agreement" is "[t]he union of two or more minds in a thing done or to be done; a coming together of parties in opinion or determination . . . . [T]he legal import of the word includes not only a promise, but also the consideration for which the promise was made." Ballentine's Law Dictionary (3d Ed. 1969). Thus, a settlement and release reflect concerted behavior. Indeed, as the foregoing discussion illustrates, settlements and releases, in the context at issue, are agreements that generally go hand in hand. See, e.g., General Statutes § 52-195c (a).

By contrast, a withdrawal shares few of the essential characteristics of a settlement and a release. Although the legislature has not defined the term withdrawal, its rules governing the manner in which a party may withdraw a cause of action inform the term's meaning. A plaintiff may withdraw an action unilaterally and unconditionally before a hearing on the merits.[7] Thus, the withdrawn party is not required to give any consideration to provide legal effect to the withdrawal. Signifi-

that the legislature, when it expressly used the limiting terms "release, settlement or similar agreement" in § 52-572h (n), contemplated that a withdrawal with consideration could operate as a settlement, the record does not demonstrate, as a matter of law, that the plaintiff received consideration in return for withdrawing his claim against Cohen so as to fall within the statute.

[7] General Statutes § 52-80 provides in relevant part: "The plaintiff may withdraw any action [returned to court] and entered in the docket of any court, before the commencement of a hearing on the merits thereof. After the commencement of a hearing on an issue of fact in any such action, the plaintiff may withdraw such action, or any other party thereto may withdraw any cross complaint or counterclaim filed therein by him, only by leave of court for cause shown." Even after a hearing on the merits, a plaintiff may withdraw an action against a party with leave of the court. Under such circumstances, however, there is no requirement of an agreement as between the parties.

cantly, a withdrawal also does not, in and of itself, extinguish the cause of action against the withdrawn party, as do a settlement and release. See *Willow Springs Condominium Assn., Inc.* v. *Seventh BRT Development Corp.*, 245 Conn. 1, 56, 717 A.2d 77 (1998); *Ramsay* v. *Camrac, Inc.*, supra, 96 Conn. App. 201–202.

The defendant contends, however, that the withdrawal in this case did operate as a surrender of a cause of action, and hence did constitute a release or settlement because the statute of limitations had expired by the time the plaintiff withdrew her action against Cohen. Thus, once the withdrawal occurred, the plaintiff could not reinstitute an action against Cohen. We are not persuaded.

At the outset, we note that the defendant never made this argument until *after* trial in his motion to set aside the verdict. Even if we were to assume that he is entitled to its review, the fact that, in a given case, the plaintiff may exercise the option of releasing a defendant at a point in time when the statute of limitations will bar her right to pursue a cause of action against that party *by operation of law* does not reflect the relinquishment of a right pursuant to an *agreement,* an essential element of a release or settlement, which, as we explain herein, must be supported by consideration to be legally enforceable. Moreover, we must construe these terms in accordance with a universal meaning, not one that is dependent on happenstance on a case-by-case basis. Accordingly, there is no linguistic or jurisprudential support for the defendant's contention that a withdrawal falls within the meaning of a release or settlement. See *Toll Gate Farms, Inc.* v. *Milk Regulation Board,* 148 Conn. 341, 349, 170 A.2d 883 (1961) ("courts cannot import an intent into legislation devoid of language fit to express it").

B

We turn next to the defendant's alternate claim that the plaintiff's withdrawal of the action against Cohen constituted a "similar agreement" under § 52-572h (n) that would have required the trial court to allow the defendant to include Cohen for apportionment purposes. We disagree.

At the outset, we underscore that the legislature frequently has used the term withdrawal. See, e.g., General Statutes §§ 52-80, 52-81, 52-82, 52-192a, 52-194 and 52-195c. Typically, the omission of a word otherwise used in the statutes suggests that the legislature intended a different meaning for the alternate term. See *M. DeMatteo Construction Co.* v. *New London*, 236 Conn. 710, 717, 674 A.2d 845 (1996) ("Where a statute, with reference to one subject contains a given provision, the omission of such provision from a similar statute concerning a related subject . . . is significant to show that a different intention existed. . . . That tenet of statutory construction is well grounded because [t]he General Assembly is always presumed to know all the existing statutes and the effect that its action or nonaction will have upon any one of them." [Internal quotation marks omitted.]). Thus, we presume that, had the legislature intended for apportionment to apply to withdrawn parties, it would have used the term "withdrawal" in lieu of, or in addition to, "similar agreement." See *Doe* v. *Norwich Roman Catholic Diocesan Corp.*, 279 Conn. 207, 216, 901 A.2d 673 (2006) ("It is a principle of statutory construction that a court must construe a statute as written. . . . Courts may not by construction supply omissions . . . or add exceptions merely because it appears that good reasons exist for adding them. . . . The intent of the legislature, as this court has repeatedly observed, is to be found not in what the legislature meant to say, but in the meaning of what it did say. . . . It is axiomatic that the court itself cannot

rewrite a statute to accomplish a particular result. That is a function of the legislature." [Internal quotation marks omitted.]).

Nonetheless, we consider whether the legislature may have used "similar agreement" to encompass withdrawals. We note that the term "similar agreement" is used only in subsection (n) of § 52-572h. It is not referenced elsewhere in that statute or in § 52-102b, which prescribes the procedures for seeking apportionment. See *Carlson* v. *Waterbury Hospital*, supra, 280 Conn. 142. Indeed, in every other section of the apportionment scheme under §§ 52-102b and 52-572h, the only type of agreements or persons subject to such agreements refer to release and settlement.[8] Therefore, consistent with its context in § 52-572h, we construe "similar agreement" to mean an agreement having the essential characteristics of a release or settlement. See Webster's Third New International Dictionary (defining "similar" as "having characteristics in common: very much alike" and "alike in substance or essentials"). A release and settlement are shaped "in accordance with the intent of the negotiations between the injured party and the settling tortfeasor." (Internal quotation marks omitted.) *Alvarez* v. *New Haven Register, Inc.*, supra, 249 Conn. 719. Accordingly, based on the common understanding and definitions of withdrawal, agreement, release and settlement set forth in part I A

---

[8] See General Statutes § 52-102b (c) ("plaintiff has previously settled or released the plaintiff's claims against such person" and "such person with whom the plaintiff settled or whom the plaintiff released was previously a party to the action"); General Statutes § 52-102b (g) ("persons with whom the plaintiff settled or whom the plaintiff released under subsection [n] of section 52-572h"); General Statutes § 52-572h (b) ("settled or released persons under subsection [n] of this section"); General Statutes § 52-572h (d) ("settled or released persons under subsection [n] of this section"); General Statutes § 52-572h (f) ("settled or released persons under subsection [n] of this section"); see footnotes 2 and 5 of this opinion for the text of these statutory provisions.

of this opinion, it is clear that a withdrawal does not constitute a similar agreement. To attribute to the term withdrawal the import of these other expressions of an exchange of benefit or promise would not comport with the legislature's intent.

Although we need not determine precisely what the legislature intended by the use of the phrase "similar agreement" in § 52-572h (n), we consider some possibilities to illustrate how other agreements may be similar to releases and settlements and, in contrast, why withdrawals do not constitute such a similar agreement. *Echavarria* v. *National Grange Mutual Ins. Co.*, 275 Conn. 408, 415, 880 A.2d 882 (2005) ("[I]t is a basic tenet of statutory construction that the legislature [does] not intend to enact meaningless provisions. . . . [I]n construing statutes, we presume that there is a purpose behind every sentence, clause, or phrase used in an act and that no part of a statute is superfluous." [Internal quotation marks omitted.]). One such possibility is the acceptance of an offer to compromise, which requires a written offer by the plaintiff to settle the claim for a sum certain, written acceptance of that offer by the defendant, payment of that sum to the plaintiff and a concomitant withdrawal of the action. See General Statutes §§ 52-192a and 52-194.

Another possibility that the plaintiff suggests is a covenant not to sue, which also is a bilateral agreement that requires consideration in exchange for the relinquishment of a claim. See, e.g., *Tomczuk* v. *Alvarez*, 184 Conn. 182, 192–93, 439 A.2d 935 (1981); *Fritz* v. *Madow*, 179 Conn. 269, 273, 426 A.2d 268 (1979); *Kosko* v. *Kohler*, 176 Conn. 383, 387, 407 A.2d 1009 (1978). We have recognized that a covenant not to sue resembles, but is not the same as, a release. See *Alvarez* v. *New Haven Register, Inc.*, supra, 249 Conn. 725 n.10 ("Although at common law a release of one joint tortfeasor released the other tortfeasors, a covenant not to

sue did not. *Bonczkiewicz* v. *Merberg Wrecking Corp.*, 148 Conn. 573, 581, 172 A.2d 917 [1961]; *Bridgeport-City Trust Co.* v. *Hirsch*, 119 Conn. 586, 589, 178 A. 423 [1935]; *Dwy* v. *Connecticut Co.*, [supra, 89 Conn. 79]. Because the present case [involves a release and] did not involve a covenant not to sue, this opinion does not have any impact on the viability of that mechanism as a means by which an injured party may seek full recovery against the employer after collecting a portion of his damages from the employee.");[9] 66 Am. Jur. 2d 374, supra, § 4 ("a covenant not to sue differs from a release in that a 'release' extinguishes a cause of action as to all joint tortfeasors whereas a 'covenant not to sue' does not extinguish the cause of action and does not release other joint tortfeasors even if it does not specifically reserve the rights against them"); see also General Statutes § 52-216a ("[a]n agreement with any tortfeasor not to bring legal action or a release of a tortfeasor in any cause of action shall not be read to a jury or in any other way introduced in evidence by either party at any time during the trial of the cause of action against any other joint tortfeasors, nor shall any

---

[9] In *Alvarez* v. *New Haven Register, Inc.*, supra, 249 Conn. 710–11, the issue was "whether, notwithstanding General Statutes § 52-572e, a release executed in favor of an employee operates as a matter of law to release the employer whose sole liability is premised on the doctrine of respondeat superior." Section 52-572e provides: "(a) For the purposes of this section the term 'joint tortfeasors' means two or more persons jointly or severally liable in tort for the same injury to person or property whether or not a judgment has been recovered against all or any of them.

"(b) A release by the injured person, or his legal representative, of one joint tortfeasor does not discharge the other tortfeasors unless, and only to the extent, the release so provides."

We concluded "that the employer and employee are not joint tortfeasors pursuant to the statute and that, accordingly, the employer is released from any derivative liability." *Alvarez* v. *New Haven Register, Inc.*, supra, 249 Conn. 711. We noted the significant differences between vicarious and joint liability, and determined that "[i]n the absence of a compelling reason to depart radically from established policy, we are reluctant to modify the common-law rule that a principal and agent are not joint tortfeasors in order to fall within § 52-572e." Id., 722.

other agreement not to sue or release of claim among any plaintiffs or defendants in the action be read or in any other way introduced to a jury").[10] Similarly, the legislature may have contemplated a stipulated judgment, which "has its roots in the law of contracts as well as the law of judgments. . . . [It is] a judgment rendered by the court upon the consent of the parties, which is in the nature of a contract to which the court has given its approval . . . ." (Citations omitted; internal quotation marks omitted.) *Kim* v. *Magnotta*, 249 Conn. 94, 106, 733 A.2d 809 (1999). Like a release and settlement, these instruments are also shaped "in accordance with the intent of the negotiations between the injured party and the settling tortfeasor." (Internal quotation marks omitted.) *Alvarez* v. *New Haven Register, Inc.*, supra, 719.

Therefore, we conclude that the legislature did not intend the term "similar agreement" to encompass a withdrawal of a defendant. This conclusion is consistent with the intent of Tort Reform II, as expressed in Public Acts 1987, No. 87-227, which "was to limit the universe of negligent persons that a finder of fact may consider in apportioning damages to only those entities that are either parties to the suit or parties who have reached a settlement agreement with the plaintiff—a clear indication that the legislature intended that § 52-572h (c) permit the plaintiff to obtain, to the maximum extent possible, complete compensation for his injuries." *Babes* v. *Bennett*, 247 Conn. 256, 270, 721 A.2d 511 (1998). Indeed, were we to hold otherwise, plaintiffs would not withdraw claims that discovery later revealed were marginal, and we thus would revive the "unwanted practical effect [under Tort Reform I] . . . that plain-

---

[10] Our case law indicates that an "agreement . . . not to bring legal action" under § 52-216a includes a covenant not to sue; see *Fritz* v. *Madow*, supra, 179 Conn. 276 (*Loiselle, J.*, dissenting); see also *Donner* v. *Kearse*, supra, 234 Conn. 676; and treats such agreements and releases as similar in effect.

tiffs [would be] required to pursue claims of weak liability against third parties, thereby fostering marginal and costly litigation in our courts." (Internal quotation marks omitted.) *Collins* v. *Colonial Penn Ins. Co.*, supra, 257 Conn. 730.

Finally, we note that our interpretation of the statute is consistent with the legislative policies that § 52-572h was designed to implement, specifically, that the plaintiff be fully compensated and defendants pay their fair share, but, that when those rights conflict, the plaintiff's interests will prevail. See, e.g., General Statutes § 52-102b (c) (holding defendant responsible for immune person's share of negligence by precluding defendant from bringing apportionment complaint against immune persons); General Statutes § 52-572h (g) (reallocating uncollectible amount from one defendant among other defendants).

C

The defendant claims that the withdrawal in the present case was unique because of the circumstances under which it was given. Specifically, the defendant claims that the withdrawal in the present case constituted a settlement because it was conditioned upon Cohen's acceptance of a list of terms that Cohen otherwise was not obligated to perform.[11] Even if we were to conclude that the legislature, when it expressly used the limiting terms "release, settlement or similar agreement" in § 52-572h (n), contemplated that a withdrawal with consideration could operate as a settlement, we disagree that the record demonstrates, as matter of law, that the plaintiff received consideration

---

[11] As noted in part I A of this opinion, we reject the defendant's claim that a withdrawal constitutes a release when, in a case like the present one, the plaintiff withdraws her claims against a party after the limitations period has expired and therefore is time-barred from reinstituting those claims.

in return for withdrawing his claim against Cohen so as to constitute a settlement pursuant to that statute.

The record reveals the following additional facts. At the hearing on the motion to set aside the verdict, the defendant claimed that the withdrawal of the action against Cohen acted as a release, settlement or similar agreement so as to bring it within § 52-572h (n). In support of the motion, the defendant provided an affidavit by Eugene Cooney, Cohen's attorney, attesting that: "[T]he plaintiff voluntarily withdrew his claim against [Cohen] without payment of a settlement. . . . In connection with the process by which the claim against [Cohen] was withdrawn, the plaintiff's attorney, Joshua D. Koskoff drew up in his own handwriting a series of terms which were to accompany the withdrawal. . . . The handwritten dates appearing at the bottom of [the document] are in my hand. As I recall, these dates represented the dates that the plaintiff wanted to call [Cohen] as a witness."[12] Koskoff vehemently objected to the defendant's interpretation of the withdrawal as an agreement that triggered the right to apportionment pursuant to § 52-572h.[13] He disagreed that there had

[12] The handwritten, unsigned note by Koskoff that was attached to Cooney's affidavit provided in its entirety: "(1) [Cooney] continues as [Cohen's] counsel for purposes of accepting subpoena, arranging testimony dates, advising Cohen. (2) Cohen has no authorization to speak to anybody about this case except [Cooney] and [the plaintiff's] counsel. (3) [Cooney] will likewise respect confidentiality and not share Cohen's positions with McNamee or counsel. (4) [Cooney] will endeavor to arrange a meeting with Cohen with [Koskoff] or, failing that, will answer written questions truthfully put to him by [Koskoff]. (5) Cohen will provide no opinions unless required to do so by the court subject to any rights of counsel to inquire within the rules of court [and] limits of disclosure." At the bottom of the page was the notation "2/5 to 2/12," which, according to his affidavit, Cooney had written to indicate the dates on which the plaintiff wanted to call Cohen as a witness.

[13] Koskoff stated: "There were some arguments made about—I think I had been forwarded as part of a supplemental motion some—and I am humbled or I find it interesting that what is clearly chicken scratch handwriting has become now an agreement between me and some other lawyer. I find that an interesting argument in light of the fact that if that were an agreement, which it wasn't, I would have potentially some remedies under

been a quid pro quo in exchange for the withdrawal and asserted that the handwritten terms simply reflected his own notes memorializing that the plaintiff had not released Cohen from the requirements of patient confidentiality to which he had been bound before the present action. Finally, as the record demonstrates, Koskoff contended that, before any determination could be made about the meaning of the handwritten note and the intent of the parties, he should be called to testify. The defendant did not call Koskoff to testify or present any other evidence on the intent of the parties as reflected in this note.

. . . what is said to be some confidentiality issues in that. I'm sure that neither defense counsel for [Cohen], I'm sure he doesn't want it to be perceived as an agreement, nor was it an agreement, and I think that he recognizes that. But if there is some allegation that has some type of effect of a release, we should certainly hear from that witness. To the contrary, all that occurred was just some understanding that it would be clear that there was no release to go about discussing these affairs with anybody. That [Cohen] had no authorization to do that, and so it was really the antithesis of a release. And certainly I think even counsel, who may have been thinking more about his relationship with the insurance company than with [Cohen], who he seems to be arguing should be held as part of an apportionment. There should be—the argument that seems to be there should be allowed to be an apportionment of fault against [Cohen]. That seems to be a conflicting argument for—that a lawyer would make on behalf of his client that hey, in fact my client should be allowed to be held responsible. So I'm sure that if [Cohen's] attorney were here, he would concede that it should have no such effect, and I won't go any further into that because I think it is entirely unfair for defense counsel in this case to make representations to the court on something that she could have no knowledge of and was not present to. And by the letter, by what is actually scratched down in an unsigned whatever you call it, piece of paper, speaks to the contrary of everything that was stated just now."

Moments later, Koskoff again protested the defendant's characterization of the document at issue: "Put me on the witness stand and we can talk about it. But I'm not—it was never raised at trial. It's not what it's purported to be. It's as desperate as I've seen in any motion, and I will not address anything about it unless we have a hearing. Unless I'm sitting in that stand, I'm not answering [the defendant's attorney's] questions at this time. That's not what we're here for."

The defendant's attorney did not follow up any further other than to confirm that the handwriting belonged to Koskoff, stating only: "So I assume,

It is well settled that "[t]he construction of a written document is a matter of law, where the meaning is to be ascertained from the document itself; but where the meaning can be understood only from extrinsic facts, the construction is generally a question of fact . . . ." *School District No. 8* v. *Lynch*, 33 Conn. 330, 333 (1866); accord *Security Equities* v. *Giamba*, 210 Conn. 71, 77–78, 553 A.2d 1135 (1989); *Finley* v. *Aetna Life & Casualty Co.*, 202 Conn. 190, 199, 520 A.2d 208 (1987), overruled in part on other grounds by *Curry* v. *Burns*, 225 Conn. 782, 786, 626 A.2d 719 (1993). "The law is clear that a contract includes not only what is expressly stated therein but also what is necessarily implied from the language used. . . . No special form of words, but that the promise appears upon a fair interpretation, is the essential. Not only then may promises exist . . . where the language is in terms that of promise, but also where the agreement shows that the parties . . . have intended an obligation though they failed so to state in clear terms." (Citations omitted; internal quotation marks omitted.) *Leventhal* v. *Stratford*, 121 Conn. 290, 295, 184 A. 587 (1936).

"In interpreting the contract, however, not only the whole language of the instrument, but the situation of the parties and the subject-matter of their transactions as well, are to be considered. . . . In arriving at the intent of the parties to a contract as expressed or implied in the language used by them, it is always admissible to consider the situation of the parties and the circumstances connected with the transaction, and every part of the writing should be considered with the help of that evidence." (Citation omitted; internal quotation marks omitted.) Id., 296.

"The construction of a contract is usually a question of fact because the interpretation of its language is a

Your Honor, that by his answer, he is not denying that it's his handwriting. Let the record reflect that."

search for the intent of the parties, making contractual intent a classic question of fact. *Lavigne* v. *Lavigne*, [3 Conn. App. 423, 427–28, 488 A.2d 1290 (1985)]. . . . A contract must be construed as a whole, with all relevant provisions considered together. *Bialowans* v. *Minor*, [209 Conn. 212, 217, 550 A.2d 637 (1988)]. The intent of the parties is to be garnered in light of the situation of the parties and the circumstances surrounding the contract, along with the primary purpose of the contract. *American Totalisator Systems, Inc.* v. *Dubno*, 210 Conn. 413, 418, 555 A.2d 421 (1989). If the language of the contract is not definitive, the trier may determine what the parties intended. *Finley* v. *Aetna Life & Casualty Co.*, supra, 202 Conn. 199." (Citation omitted.) *Foley* v. *Huntington Co.*, 42 Conn. App. 712, 730–31, 682 A.2d 1006, cert. denied, 239 Conn. 931, 683 A.2d 397 (1996).

We cannot conclude that the record in the present case demonstrates *as a matter of law* that the parties intended a quid pro quo in exchange for the withdrawal, in other words, consideration. This is particularly true when the handwritten note is entirely consistent with Koskoff's claim to the trial court that the note merely memorialized the plaintiff's reminder to Cohen of the rules of confidentiality to which he otherwise was obligated once the case against him had been withdrawn. See General Statutes § 52-146o.[14] "Consideration con-

[14] General Statutes § 52-146o provides in relevant part: "(a) Except as provided in sections 52-146c to 52-146j, inclusive, and subsection (b) of this section, in any civil action or any proceeding preliminary thereto or in any probate, legislative or administrative proceeding, a physician or surgeon, as defined in subsection (b) of section 20-7b, shall not disclose (1) any communication made to him by, or any information obtained by him from, a patient or the conservator or guardian of a patient with respect to any actual or supposed physical or mental disease or disorder or (2) any information obtained by personal examination of a patient, unless the patient or his authorized representative explicitly consents to such disclosure.

"(b) Consent of the patient or his authorized representative shall not be required for the disclosure of such communication or information (1) pursuant to any statute or regulation of any state agency or the rules of court, (2) by a physician, surgeon or other licensed health care provider against

sists of a benefit to the party promising, or a loss or detriment to the party to whom the promise is made. . . . Although an exchange of promises usually will satisfy the consideration requirement . . . a promise to do that which one is already bound by his contract to do is not sufficient consideration to support an additional promise by the other party to the contract." (Citations omitted; internal quotation marks omitted.) *Christian* v. *Gouldin*, 72 Conn. App. 14, 23, 804 A.2d 865 (2002); see also 1 Restatement (Second), Contracts § 71, p. 172 (1981).

Indeed, Koskoff, as the drafter, disputed the defendant's characterization of the document as an "agreement" between Cohen and the plaintiff contending that it did not reflect such an intent by the participants. See footnote 13 of this opinion. Moreover, the defendant did not avail himself of Koskoff's offer to testify to what the document was intended to accomplish. Certainly Cooney's statement in his affidavit that the terms "were to accompany" the withdrawal does not indicate unambiguously that that withdrawal was conditioned on the terms. Consequently, given the ambiguity as to the meaning of this document, the trial court properly could have considered such extrinsic evidence as to the conduct of the parties.[15] *Electric Cable Com-*

whom a claim has been made, or there is a reasonable belief will be made, in such action or proceeding, to his attorney or professional liability insurer or such insurer's agent for use in the defense of such action or proceeding . . . ."

[15] Such extrinsic evidence would not have been barred by the parol evidence rule, which "is premised upon the idea that when the parties have deliberately put their engagements into writing, in such terms as import a legal obligation, without any uncertainty as to the object or extent of such engagement, it is conclusively presumed, that the whole engagement of the parties, and the extent and manner of their understanding, was reduced to writing." (Internal quotation marks omitted.) *Alstom Power, Inc.* v. *Balcke-Durr, Inc.*, 269 Conn. 599, 609, 849 A.2d 804 (2004). The document in this case was not even signed and hardly could constitute an integrated contract at which the parol evidence ruled is aimed. Moreover, even were the rule operative, it does not of itself "forbid the presentation of parol evidence, that is, evidence outside the four corners of the contract concerning matters

*pounds, Inc.* v. *Seymour*, 95 Conn. App. 523, 532, 897 A.2d 146 (2006). "Whether an agreement is supported by consideration is a factual inquiry reserved for the trier of fact and subject to review under the clearly erroneous standard." *Benedetto* v. *Wanat*, 79 Conn. App. 139, 150, 829 A.2d 901 (2003). On the basis of the record in the present case, the trial court properly could not have determined that the withdrawal in this case conclusively constituted a release, settlement or other similar agreement pursuant to § 52-572h.

## D

Accordingly, we conclude that the trial court properly precluded the defendant from pursuing an apportionment complaint against Cohen on the basis of its determination that, because the plaintiff had withdrawn the action against Cohen, there was no "release, settlement or similar agreement" that brought Cohen within the scope of § 52-572h. We recognize, however, the hardship to defendants similarly situated to the one in the present case. Section 52-102b (f) provides the "exclusive means by which a defendant may add a person who is or may be liable pursuant to section 52-572h for a proportionate share of the plaintiff's damages as a

governed by an integrated contract, but forbids only the use of such evidence to vary or contradict the terms of such a contract. Parol evidence offered solely to vary or contradict the written terms of an integrated contract is, therefore, legally irrelevant. When offered for that purpose, it is inadmissible not because it is parol evidence, but because it is irrelevant. By implication, such evidence may still be admissible if relevant (1) to explain an ambiguity appearing in the instrument; (2) to prove a collateral oral agreement which does not vary the terms of the writing; (3) to add a missing term in a writing which indicates on its face that it does not set forth the complete agreement; or (4) to show mistake or fraud. . . . These recognized exceptions are, of course, only examples of situations where the evidence (1) does not vary or contradict the contract's terms, or (2) may be considered because the contract has been shown not to be integrated; or (3) tends to show that the contract should be defeated or altered on the equitable ground that relief can be had against any deed or contract in writing founded in mistake or fraud." (Internal quotation marks omitted.) Id., 609–10.

party to the action." Section 52-102b, however, provides a means to seek apportionment against persons who are not parties to the action only if an apportionment complaint is filed within 120 days after the return date in the plaintiff's original complaint; see General Statutes § 52-102b (a);[16] or against "settled" or "released" persons. See General Statutes § 52-102b (c). Thus, under the procedural scheme prescribed by the legislature, the defendant could not file an apportionment complaint against Cohen while he was a party. For the reasons set forth in part I A, B and C of this opinion, the defendant also could not seek apportionment against Cohen under the procedures for released or settled persons. Thus, this legislative gap leaves the defendant without recourse to obtain apportionment.

"The legislature [however] has repeatedly manifested its concern for the overall fairness of our tort law. See, e.g., General Statutes § 52-572e. [We] hope that the legislature will be able to find a place on its busy agenda for inquiry into the consequences and the desirability of today's decision." *Alvarez* v. *New Haven Register, Inc.*, supra, 249 Conn. 728 (*Peters, J.*, concurring).

## II

We next turn to the defendant's claim that the trial court improperly precluded him from presenting an alternative theory as to the cause of the shoulder dystocia, which in turn was the cause of Jodee's injury. Specifically, the defendant contends that, based on Cohen's testimony as to the circumstances of the delivery, the defendant should have been permitted to offer his expert opinion that the shoulder dystocia was caused by Jodee's unusual, and thus unforeseeable,

---

[16] We note that this case does not require that we express an opinion as to whether a defendant may file an apportionment complaint against a withdrawn party if the withdrawal and service of the apportionment complaint occurs within the 120 days specified for nonparties under § 52-102b (a).

position at birth, rather than facts that the defendant reasonably could have foreseen. The defendant contends that the trial court precluded him from offering his opinion predominately based on its improper conclusion that Cohen's testimony as to the pertinent facts was not credible and, secondarily, based on its improper conclusion that the plaintiff did not have adequate notice that the defendant intended to advance this alternate theory. We reject the defendant's claim.

Under the rules of evidence, "[a]n expert may testify in the form of an opinion and give reasons therefor, provided sufficient facts are shown as the foundation for the expert's opinion." Conn. Code Evid. § 7-4 (a). "An expert may have personal knowledge of the underlying facts or may obtain the requisite information by attending the trial and hearing the factual testimony. C. Tait, Connecticut Evidence (3d Ed. 2001) § 7.9.1, p. 532; see also Conn. Code Evid. § 7-4 (b). If an expert has heard all of the relevant testimony, it is also within the court's discretion to permit a question predicated on that testimony. C. Tait, supra, § 7.9.1, p. 532. Finally, an expert may obtain information at trial by having factual testimony summarized in the form of a hypothetical question at trial. Id.; Conn. Code Evid. § 7-4 (c)." *State* v. *Carpenter*, 275 Conn. 785, 812 n.13, 882 A.2d 604 (2005), cert. denied, 547 U.S. 1025, 126 S. Ct. 1578, 164 L. Ed. 2d 309 (2006). "[T]he trial court has wide discretion in ruling on the admissibility of expert testimony and, unless that discretion has been abused or the ruling involves a clear misconception of the law, the trial court's decision will not be disturbed." (Internal quotation marks omitted.) Id., 805.

The record reveals the following additional facts. At trial, the plaintiff offered expert testimony to establish that the defendant had breached the standard of care by failing to ascertain and recognize various risk factors for shoulder dystocia before and during Aponte's early

stages of labor and then by failing to perform a cesarean section. In particular, the plaintiff's experts opined that Jodee's unusually large size, more than ten pounds at birth, was the predominant cause of the shoulder dystocia.

Cohen testified as a fact witness as to the circumstances of the delivery. Specifically, he testified about various maneuvers that he had undertaken when attempting to deliver Jodee after he ascertained that shoulder dystocia had occurred. First, he "reach[ed] into the birth canal to try to find the baby's back arm and/or hand" to pull that part of the baby's body out first to reduce the diameter of the shoulders. When he could not find the baby's arm on this first attempt, he inserted his hands inside the mother's vagina to try to prod the baby's shoulders to rotate from their top to bottom position into a sideways position. After that effort did not work, he attempted unsuccessfully to fracture the baby's collarbone to reduce the shoulder diameter. Next, Cohen applied a maneuver whereby the mother's legs were held into the air and pressure was exerted above her pelvis in another unsuccessful attempt to rotate the baby's shoulders.

Cohen then stated: "And so I went back to my original attempt reaching into the birth canal looking for the back arm and to my surprise I found the baby's fist right adjacent [to] the shoulder, the back shoulder, of the baby as it was coming out. It was in a position that I didn't expect to find it because I expected the arm and fist to be somewhat in front of the baby but in this case [it] was right along the side of the shoulder and somewhat behind. And I grasped that fist and gently applied traction to it and the baby's arm basically reached out toward me and the baby basically fell out into my arms."

Subsequently, the defendant testified that the reason for the lack of progress in Aponte's labor when he

was monitoring her "was clearly the patient's refusal to push. Once the patient would push, I had a clear assumption that she would deliver vaginally, and she did." Thereafter, the defendant's counsel asked the defendant whether he had an opinion, to a reasonable degree of medical certainty, as to why Jodee's shoulders were stuck at the pelvis at the time of delivery. The plaintiff objected on the ground that the defendant had no personal knowledge on which to base his opinion, given that he was not present at the birth and did not know that Jodee had been injured until some later point in time. The trial court sustained the objection, ruling that the defendant must establish a foundation for the basis of his opinion.

Accordingly, the defendant's counsel asked the defendant to base his expert opinion as to the cause of the shoulder dystocia on the following hypothetical situation: "Assume that at the time of delivery after several attempts were made to dislodge the shoulders, it was found that one of the baby's fists was found to be located somewhat behind one of the shoulders, and once that fist was released, that Jodee was delivered easily after that." The plaintiff again objected, asserting that the hypothetical scenario had failed to represent fully the facts at the time of Jodee's delivery. The court sustained the objection, agreeing that the record contained additional facts necessary to present a more complete and accurate picture in the hypothetical situation, such as the specific maneuvers that Cohen had performed and which shoulder and arm he first had pulled out. Before the defendant proceeded, the plaintiff asked the court to require that the defendant make an offer of proof as to what he intended to establish with this testimony. The plaintiff raised several concerns, including the relevance of the testimony, given that the defendant had agreed that shoulder dystocia had been the cause of Jodee's injuries and, therefore, any counter

theory as to how a child hypothetically could have gotten injured would not be relevant. The defendant admitted that he had agreed that shoulder dystocia caused Jodee's injury. He asserted, however, that he should be able to offer an opinion, based on Cohen's testimony, that Jodee's shoulders may have been stuck, not because they were too large to fit through the birth canal, as the plaintiff's experts had opined, but, rather, because the position of Jodee's hand adjacent to her shoulder had increased the diameter around her shoulders. The plaintiff then objected on several grounds: no expert had testified that this factual scenario was among those creating a risk of shoulder dystocia and therefore a *Porter* hearing[17] was required to determine the reliability of such a conclusion; the defendant's testimony would be speculative because Cohen's testimony did not indicate that Jodee's hand position was responsible for causing her shoulders to become lodged; the defendant previously had not disclosed this theory; and the testimony was not relevant.

Although the trial court agreed with the plaintiff's disclosure claim, it sustained the objection based on the speculative nature of the defendant's hypothetical and the absence of support in the record for its factual predicate. Specifically, the defendant had made it clear that he intended to predicate his opinion on the factual assumption that, during the entire time Jodee had been lodged in her mother's pelvis, her hand always had been where Cohen found it in his final attempt to extricate the baby, adjacent to her back shoulder. The court repeatedly stated that it was too great an inferential leap to conclude, based on Cohen's testimony, that Jodee's hand had been in that position the entire time. The court noted that, according to his testimony, in his last attempt to dislodge Jodee's shoulders, Cohen had

---

[17] See *State* v. *Porter*, 241 Conn. 57, 698 A.2d 739 (1997), cert. denied, 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998).

repeated the first maneuver he had tried, but with a different result, and Cohen had undertaken several other maneuvers in between those efforts to attempt to manipulate Jodee's position. The court further noted that Cohen never had testified that the position of Jodee's hand was the cause of the shoulder dystocia. Accordingly, the court refused to allow the defendant to offer his opinion on causation of the shoulder dystocia based on his hypothetical scenario.

Turning to the defendant's claim, it is clear from the record that the defendant has misconstrued the trial court's statements regarding the inferential "leap" at issue as a determination of the credibility of Cohen's testimony. The court concluded that the defendant's opinion would have been based on speculation, and not on reasonable inferences from the facts established by Cohen's testimony. The defendant similarly misconstrues the court's comments on the discharge summary Cohen had prepared after Aponte's delivery. The court deemed it "curious" that Cohen's discharge summary did not reflect anything about Jodee's hand position affecting the delivery. In response to defense counsel's argument that the discharge summary was not inconsistent with Cohen's testimony, the court stated, "I'm not saying it's inconsistent, I'm just saying . . . it seems to be an important fact that was left out of the discharge summary." The court thereafter related this point to its ruling that the evidence did not support the hypothetical. In other words, the court's point was that, if Cohen thought that the baby's hand position had been the cause of the problem, one would have expected Cohen to note it, rather than limit his comments to the position of the shoulders. Indeed, later, at the charging conference, the court stated: "I don't know if shoulder dystocia includes a hand that may be up there, and if so, why didn't . . . Cohen write in his summary that he found the hand and pulled it out and it wasn't the shoulder

hung up but it was a hand?" The court did not suggest that, because Cohen had omitted information about Jodee's hand placement in his discharge summary, he must not have been truthful when testifying regarding that matter. Rather, the court indicated that Cohen's summary was consistent with his testimony, in which he similarly did not state or provide facts from which one reasonably could infer that Jodee's hand position had remained constant throughout the delivery and thus had caused the shoulder dystocia.

"The established rule is that, on direct examination, the stated assumptions on which a hypothetical question is based must be the essential facts established by the evidence." *Keeney* v. *L & S Construction*, 226 Conn. 205, 213, 626 A.2d 1299 (1993); accord Conn. Code Evid. § 7-4 (a) ("[a]n expert may testify in the form of an opinion and give reasons therefor, provided sufficient facts are shown as the foundation for the expert's opinion"). In the present case, we cannot conclude that the trial court abused its discretion in concluding that the factual predicate of the hypothetical on which the defendant intended to base his expert opinion was not supported by the evidence and, hence, was speculative. See *State* v. *Carpenter*, supra, 275 Conn. 805.

### III

The defendant next claims that the trial court submitted to the jury improper and misleading interrogatories. Specifically, the defendant claims that the interrogatories impermissibly guided the jury to reach a particular result in favor of the plaintiff, rather than explained or limited a general verdict, as is intended under the rules of practice. We disagree.

"In *Freedman* v. *New York, N.H. & H. R. Co.*, 81 Conn. 601, [612] 71 A. 901 (1909), this court observed . . . that the purpose of interrogatories was to elicit 'a determination of material facts, [and] to furnish the

means of testing the correctness of the verdict rendered, and of ascertaining its extent.' " *Gaulton* v. *Reno Paint & Wallpaper Co.*, 177 Conn. 121, 125, 412 A.2d 311 (1979); see also *Blanchette* v. *Barrett*, 229 Conn. 256, 262–63 n.6, 640 A.2d 74 (1994) (interrogatories "[provide] a means by which the jury [could] record the findings of fact [that] form[ed] the basis for their verdict" [internal quotation marks omitted]). "The power of the trial court to submit proper interrogatories to the jury, to be answered when returning their verdict, does not depend upon the consent of the parties or the authority of statute law. In the absence of any mandatory enactment, it is within the reasonable discretion of the presiding judge to require or to refuse to require the jury to answer pertinent interrogatories, as the proper administration of justice may require. *Freedman* v. *New York, N.H. & H. R. Co.*, [supra, 612]." (Internal quotation marks omitted.) *Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *Cole*, 189 Conn. 518, 527, 457 A.2d 656 (1983). "The trial court has broad discretion to regulate the manner in which interrogatories are presented to the jury, as well as their form and content." *Corcoran* v. *Taylor*, 65 Conn. App. 340, 346, 782 A.2d 728, cert. denied, 258 Conn. 925, 783 A.2d 1027 (2001).

In the present case, the plaintiff's amended complaint asserted nine allegations to support his claim that the defendant had breached the standard of care, in that he had: (1) failed to obtain an adequate history of Aponte's 1988 labor and delivery; (2) failed to manage properly Aponte's second stage of labor; (3) failed to assess properly Aponte's risk factors for shoulder dystocia; (4) failed to diagnose timely risk factors of shoulder dystocia; (5) failed to monitor the progress of labor; (6) permitted a prolonged second stage of labor; (7) failed to diagnose properly arrest of descent; (8) failed to listen to Aponte;[18] and (9) failed to perform a cesarean

---

[18] It appears that this allegation refers to Aponte's testimony that she had told the defendant that she was unable to push the baby out and that she

section. At the end of trial, over the defendant's objection, the trial court submitted interrogatories to the jury that listed each of the aforementioned nine allegations as a basis for establishing that the defendant had breached the standard of care. The jury responded affirmatively to eight of the nine questions, answering in the negative only to the fifth question regarding monitoring Aponte's labor.

In our view, the court's interrogatories to the jury are consistent with the purpose of this device, to elicit "a determination of material facts, [and] to furnish the means of testing the correctness of the verdict rendered, and of ascertaining its extent." *Freedman* v. *New York, N.H. & H. R. Co.*, supra, 81 Conn. 612. Moreover, we see no undue prejudice to the defendant simply by restating in the interrogatories the factual allegations forming the basis of the complaint as to the breach of the standard of care. Cf. *Hammond* v. *Waterbury*, 219 Conn. 569, 581, 594 A.2d 939 (1991) (concluding trial court had not abused its discretion by refusing to submit defendant's proposed interrogatories in light of court's determination that they were "confusing and [did] not track the . . . issues [submitted] . . . for the jury" and agreeing that they asked jury "to consider legal principles not applicable to the facts in issue" [internal quotation marks omitted]). Finally, although the rules of practice specifically address interrogatories as they relate to a general verdict; see Practice Book § 16-18 ("[t]he judicial authority may submit to the jury written interrogatories for the purpose of explaining or limiting a general verdict"); this court never has limited the trial court's discretion in providing interrogations to such cases. See, e.g., *Bovat* v. *Waterbury*, 258 Conn. 574, 584–85, 783 A.2d 1001 (2001) (interrogatories in single cause of action for highway defect properly stated both

had asked him to perform a cesarean section after experiencing problems in the early stages of her labor.

design defect and defect in repair as basis for verdict). Accordingly, we conclude that the trial court did not abuse its discretion in submitting the interrogatories to the jury.

## IV

The defendant also claims that the cumulative effect of three aspects of the trial resulted in undue prejudice. Specifically, the defendant claims that: (1) the trial court improperly allowed the plaintiff's experts to testify as to Aponte's lack of informed consent when there was no informed consent claim in the case; (2) the court improperly ruled on the admission of expert testimony regarding the effect of Jodee's juvenile diabetes on her earning capacity for purposes of damage calculations; and (3) the "general trial atmosphere rendered impossible a dispassionate evaluation of the relative role of [the defendant] in its proper context." We disagree.

We note at the outset that the defendant's evidentiary claims are reviewed under our well established standard. "The trial court's ruling on the admissibility of evidence is entitled to great deference. . . . [T]he trial court has broad discretion in ruling on the admissibility . . . of evidence . . . [and its] ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion. . . . Moreover, evidentiary rulings will be overturned on appeal only where there was an abuse of discretion and a showing by the defendant of substantial prejudice or injustice." (Internal quotation marks omitted.) *Jacobs* v. *General Electric Co.*, 275 Conn. 395, 406, 880 A.2d 151 (2005).

## A

Turning to the challenged testimony as to the issue of informed consent, the defendant points to testimony

from two of the plaintiff's experts and from Aponte. Specifically, two of the plaintiff's experts stated that, given Jodee's size at birth, the standard of care would require that a physician inform a patient as to the risks and benefits of vaginal delivery and a cesarean section. Aponte testified that the defendant never had informed her of any risks associated with delivering Jodee vaginally. The defendant objected, contending that because there was no informed consent claim in this case, the testimony was irrelevant. The trial court overruled the defendant's objection based on its determination that the testimony was relevant to the plaintiff's claim that the defendant had breached the standard of care by failing to assess properly the risks of shoulder dystocia. We agree with the trial court.

We recognize that, although this testimony undoubtedly would bear on informed consent if that were an issue in the case; see generally *Logan* v. *Greenwich Hospital Assn.*, 191 Conn. 282, 290–93, 465 A.2d 294 (1983) (discussing development and elements of informed consent as basis for medical malpractice liability); the plaintiff did not assert a lack of informed consent claim. This testimony, however, also was directly relevant to a claim that the plaintiff did assert, namely, that the defendant had failed to recognize that Aponte's delivery presented a risk of shoulder dystocia. If, as the plaintiff's experts had testified, the standard of care would have obligated the defendant to discuss the risks of vaginal delivery with Aponte, his failure to do so would provide evidence that he had not in fact recognized that those risks were present. Therefore, the trial court did not abuse its discretion in concluding that this evidence was relevant. See *State* v. *Cortes*, 276 Conn. 241, 254, 885 A.2d 153 (2005) ("Relevant evidence, that is, 'evidence having any tendency to make the existence of any fact that is material to the determination of the proceeding more probable or less probable than

it would be without the evidence' . . . Conn. Code Evid. § 4-1; generally is admissible; Conn. Code Evid. § 4-2; unless 'its probative value is outweighed by the danger of unfair prejudice or surprise, confusion of the issues, or misleading the jury, or considerations of undue delay, waste of time or needless presentation of cumulative evidence.' Conn. Code Evid. § 4-3.").

Moreover, the trial court expressly instructed the jury that informed consent was not at issue in the case. It is well established that, "[i]n the absence of any indication to the contrary, we presume that the jury followed the court's instruction[s]."[19] (Internal quotation marks omitted.) *State* v. *Alston*, 272 Conn. 432, 446, 862 A.2d 817 (2005). Accordingly, the trial court did not abuse its discretion with respect to its rulings and instruction on informed consent.

B

The defendant also challenges the trial court's rulings relating to evidence of Jodee's juvenile diabetes as it pertained to the calculation of economic damages. The defendant claims that the trial court improperly permitted Lawrence Forman, the plaintiff's vocational expert, to offer unscientific testimony because Forman had

---

[19] The defendant criticizes the trial court's limiting instruction, however, as improperly discrediting his testimony on consent as irrelevant after permitting the plaintiff to offer evidence as to that matter. We also disagree with this contention. In support of his testimony that he had discussed with Aponte the risks and benefits of, and alternatives to, a cesarean section, the defendant offered a consent form, which he had signed. The defendant admitted, however, that Aponte had not signed the form, and he had no recollection as to why she had not done so. Accordingly, following the trial court's instructions to the jury that informed consent was not an issue in the case, the court stated: "[T]here was no evidence of written consent. And I further instruct you that it is immaterial for your consideration whether or not . . . Aponte agreed to a procedure or a plan." We do not read this instruction as improperly discounting the defendant's testimony, which, if credited, only would have demonstrated that he had discussed the situation with Aponte, not that she had understood what the defendant told her or that he had obtained her consent.

failed to consider the effect of Jodee's juvenile diabetes on her vocational capacity and earnings. The defendant further claims that, although the trial court had permitted him to cross-examine Forman and argue to the jury about Forman's failure to consider this condition, the court improperly precluded him from offering expert testimony to demonstrate that this condition would affect Jodee's work capacity and life expectancy. We disagree.

Turning first to Forman's testimony, we note that the defendant does not claim that the methodology by which Forman reached his conclusion was unreliable. Rather, he claims that Forman's application of that methodology to the facts of the case was unreliable because Forman had failed to consider Jodee's juvenile diabetes. We disagree with his claim on two fronts. First, our review of Forman's testimony reflects that he clearly stated that he had considered Jodee's juvenile diabetes, but concluded that it was not relevant to her vocational capacity because that condition can be controlled through medication and diet. Second, it is well settled that, "[o]nce the validity of a scientific principle has been satisfactorily established, any remaining questions regarding the manner in which that technique was *applied* in a particular case . . . generally [present] an issue of fact that goes to weight, and not admissibility." (Emphasis in original.) *State* v. *Porter*, 241 Conn. 57, 88 n.31, 698 A.2d 739 (1997), cert. denied, 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998); accord *State* v. *Reid*, 254 Conn. 540, 551–52, 757 A.2d 482 (2000) (rejecting defendant's claim that trial court improperly admitted testimony from state's expert concerning microscopic hair analysis because expert did not evaluate all of hair characteristics discussed in forensic literature, and because he did not take measurements, or quantify certain characteristics, of hair sample). Accordingly, the trial court properly determined that

Forman's decision not to factor Jodee's juvenile diabetes into his calculations was the grist for the cross-examination mill.

The defendant further claims that, once Forman was permitted to offer an opinion as to Jodee's vocational capacity, the trial court improperly precluded him from offering expert testimony in two forms to establish that juvenile diabetes would affect her vocational capacity and life expectancy. First, the trial court precluded, on the ground that the defendant's disclosure was untimely, expert testimony from Joseph Rosenblatt, an endocrinologist, and James Cohen,[20] a vocational rehabilitation specialist, whom the defendant claimed would testify that juvenile diabetes would affect Jodee's life and should have been considered by Forman. The defendant claims that his disclosure of these witnesses was not untimely; rather, he disclosed them within two weeks after it first became apparent to him that the plaintiff's experts, Forman and Gary Crakes, an economist, had not taken into account Jodee's medical condition. Specifically, the defendant points to Crakes' deposition on November 30, 2004, as the point in time when this fact first became known to him. We disagree.

The record reveals the following additional undisputed facts. In January, 1999, the plaintiff disclosed Forman and Crakes as his experts regarding damages. In January, 2002, and August, 2004, respectively, Forman and Crakes submitted their reports; neither report reflected any indication that they considered

[20] The defendant also listed Ian Cohen, the former defendant in the case, as an expert witness. The trial court precluded the defendant from offering Ian Cohen as an expert, limiting his testimony as a fact witness. Although the defendant suggests throughout his brief to this court that this ruling exacerbated the prejudice to him stemming from the court's ruling on apportionment, he does not raise the trial court's ruling as to the limitation on Ian Cohen's testimony as an issue in this appeal. See footnote 4 of this opinion.

Jodee's juvenile diabetes to be a relevant factor. In November, 2002, the plaintiff provided to the defendant, in response to his discovery requests, the records for the diabetes clinic where Jodee was being treated. On May 13, 2002, in response to requests by the defendant, the trial court issued a scheduling order that extended the deadline for deposing expert witnesses until September 6, 2002. On June 3, 2004, the defendant completed his deposition of Forman. He filed his disclosures of Rosenblatt and James Cohen on December 10, 2004, and December 13, 2004, respectively, while jury selection was in progress.

The trial court granted the plaintiff's motion to preclude these witnesses on the grounds of undue prejudice, undue interference with the orderly progress of the trial and bad faith delay in the disclosures. Specifically, the court noted the facts that: the scheduling order long had expired; jury selection was in progress; the trial was scheduled to commence on February 1, 2005; the defendant's experts would be introducing a new element into the trial—shortened life expectancy due to juvenile diabetes; and the defendant had known of Jodee's condition and of the plaintiff's experts several years earlier.

Given these facts, "[t]he court was well within its discretion to prevent this kind of ambush." *Gaudio* v. *Griffin Health Services Corp.*, 249 Conn. 523, 548, 733 A.2d 197 (1999) (no abuse of discretion when disclosure made thirty days before trial and defendant could have raised issue years ago); see *Pool* v. *Bell*, 209 Conn. 536, 540–41, 551 A.2d 1254 (1989) (no abuse of discretion when disclosure made three weeks before scheduled trial date and defendant disclosed witness six months after deadline under scheduling order), superseded by statute on other grounds as stated in *Wood* v. *Bridgeport*, 216 Conn. 604, 609, 583 A.2d 124 (1990). Indeed, at the latest, on June 3, 2004, after completing Forman's

deposition, the defendant knew that Forman had not factored the juvenile diabetes into his calculation. Under the rules of practice, the defendant was obligated to disclose his experts within a reasonable time prior to trial. See Practice Book § 13-4 (4).[21] He failed to act timely, however, based on the information readily available to him.[22]

Finally, we briefly address the second form in which the defendant sought to establish that Forman's exclusion of juvenile diabetes as a factor in Jodee's vocational capacity was incorrect. Specifically, the defendant claims that the trial court improperly excluded as irrelevant evidence that would have contradicted Forman's assumption that Jodee's diabetes could be controlled. The defendant contends that testimony from Sevket Yigit, the physician who had treated Jodee at the Connecticut Children's Medical Center Diabetes Clinic, and

[21] Practice Book § 13-4 (4) provides in relevant part: "In addition to and notwithstanding the provisions of subdivisions (1), (2) and (3) of this rule, any plaintiff expecting to call an expert witness at trial shall disclose the name of that expert, the subject matter on which the expert is expected to testify, the substance of the facts and opinions to which the expert is expected to testify, and a summary of the grounds for each opinion, to all other parties within a reasonable time prior to trial. Each defendant shall disclose the names of his or her experts in like manner within a reasonable time from the date the plaintiff discloses experts, or, if the plaintiff fails to disclose experts, within a reasonable time prior to trial. If disclosure of the name of any expert expected to testify at trial is not made in accordance with this subdivision, or if an expert witness who is expected to testify is retained or specially employed after a reasonable time prior to trial, such expert shall not testify if, upon motion to preclude such testimony, the judicial authority determines that the late disclosure (A) will cause undue prejudice to the moving party; or (B) will cause undue interference with the orderly progress of trial in the case; or (C) involved bad faith delay of disclosure by the disclosing party. . . ."

[22] Moreover, we find the defendant's claim somewhat hypocritical given that he sought to preclude one of the plaintiff's experts, whom the plaintiff had disclosed on January 20, 2004, on the ground that the deadline under the trial court's scheduling order for disclosing expert witnesses had expired and, at that time, it was anticipated that trial would commence in four months.

the clinic's treatment records were relevant to this issue. We disagree.

Briefly stated, Yigit never opined that Jodee's condition could not be controlled. Yigit expressly rejected the defendant's suggestion that Jodee was at risk of complications from her condition because her father had died of complications from the same disease. Indeed, Yigit never even stated that Jodee's condition was not being controlled regularly; he noted that the records reflected an entry from one visit in which he had noted a concern about inadequate control due to, inter alia, multiple caregivers, but also that his examination reflected that "everything looked fine." Accordingly, the trial court did not abuse its discretion by excluding this evidence on grounds of relevancy.

C

The defendant also makes a broad claim that he was prejudiced by certain conduct by the plaintiff's counsel during the proceedings, such as facial grimaces, body language and interruptions to his closing argument. The defendant concedes that the trial court addressed most of the contested conduct, but contends that the trial court's action was ineffective as evidenced by the fact that the conduct continued.

To the extent that the trial court's actions and the admissions by the plaintiff's counsel to this court reflect that the plaintiff's counsel engaged in such conduct, we note that we do not sanction any conduct that may divert the jury's attention from the issues properly before it. Nonetheless, in the absence of a request by the defendant for further instruction or a mistrial, we presume that the trial court took appropriate remedial measures to preserve the defendant's right to a fair trial.

V

Finally, we address the defendant's claim that the trial court lacked personal jurisdiction over him. Specif-

ically, the defendant claims that service of process was defective because the plaintiff had not served the defendant either personally or at his usual place of abode, in accordance with General Statutes §§ 52-54 and 52-57 (a). It is undisputed that the plaintiff served the summons and complaint on the office manager at Associated Health, the defendant's obstetric practice group. The defendant further claims that, under this court's decision in *FitzSimmons* v. *International Assn. of Machinists*, 125 Conn. 490, 7 A.2d 448 (1939), reversal of the judgment is the proper remedy. We decline to review this claim because it was not preserved properly for appeal.

The record reveals the following additional facts. The plaintiff commenced this action on August 22, 1997. The defendant filed his motion to dismiss for lack of personal jurisdiction on October 17, 1997. The plaintiff filed a memorandum in opposition to that motion on December 3, 1997, claiming that: (1) the defendant had actual notice, which was consistent with the purpose of the service of process statutes; and (2) unnecessary delay and confusion would result if the motion were granted because the plaintiff would be able to file a new action against the defendant under the accidental failure of suit statute, General Statutes § 52-592, and the plaintiff then would file a motion to consolidate that action with the action against the then remaining defendants in the case. The defendant took no further action to claim the motion, and the trial court did not rule on the motion to dismiss until May 7, 2001, as indicated by the notation of "[d]enied" on a postcard dated May 11, 2001. The defendant timely filed a motion for articulation; however, the court took no action on that motion, and the defendant took no steps to compel any action.

It is well settled under our rules of practice and case law that, "[i]t is incumbent upon the appellant to take

the necessary steps to sustain its burden of providing an adequate record for appellate review. . . . [A]n appellate tribunal cannot render a decision without first fully understanding the disposition being appealed. . . . Our role is not to guess at possibilities, but to review claims based on a complete factual record developed by a trial court." (Internal quotation marks omitted.) *Stutz* v. *Shepard*, 279 Conn. 115, 125–26, 901 A.2d 33 (2006); see Practice Book § 61-10 ("[i]t is the responsibility of the appellant to provide an adequate record for review").

In the present case, we have no record from which to determine the basis of the trial court's ruling. The trial court may have relied on one of the grounds asserted in the plaintiff's opposition, or on the ground of waiver, as the plaintiff now claims before this court, because of the defendant's actions in proceeding with his defense in the intervening years between the defendant's filing of the motion and the court's decision on the motion, or on some other ground. "Conclusions of the trial court cannot be reviewed where the appellant fails to establish through an adequate record that the trial court incorrectly applied the law or could not reasonably have concluded as it did . . . ." (Internal quotation marks omitted.) *Daigle* v. *Metropolitan Property & Casualty Ins. Co.*, 257 Conn. 359, 364, 777 A.2d 681 (2001). Accordingly, we decline to review this claim.

The judgment is affirmed.

In this opinion BORDEN and NORCOTT, Js., concurred.

BORDEN, J., concurring. I agree with and join the majority opinion. I write separately solely to register my conclusion that the withdrawal of a negligence claim

against a defendant that is supported by consideration, constitutes a "similar agreement" within the meaning of General Statutes § 52-572h (n), and therefore, triggers the apportionment of liability provisions of that statute. Simply stated, it is apparent to me that such an arrangement would fall comfortably within both the language and policies of the apportionment statute and, as such, there is no reason to exclude a withdrawal executed and filed in exchange for bargained for consideration—not necessarily financial—from the terms of the statute. The following hypothetical illustrates my point. Suppose a plaintiff withdraws his or her negligence action[1] against a defendant in exchange, say, for that defendant's promise to take, or to refrain from taking, certain actions in the future, or in exchange, say, for that defendant's promise to make a charitable contribution to a particular charity. Although no money changed hands between the parties, it is clear that the plaintiff's withdrawal was predicated on a bargained for agreement from which the plaintiff derived a significant benefit. The fact that this benefit was not expressed in monetary terms should make no difference in determining the applicability of § 52-572h.

PALMER, J., with whom ZARELLA, J., joins, dissenting. I disagree with the majority's conclusion that the trial court properly construed General Statutes § 52-572h (n)[1] as precluding the defendant Thomas McNamee from raising an apportionment claim against Ian Cohen, who, for seven years, also was a defendant in

---

[1] I note that § 52-572h is a statute of general applicability that applies to all actions predicated on theories of negligence.

[1] See footnote 2 of the majority opinion for the relevant text of § 52-572h.

this action[2] until, during jury selection, the plaintiff[3] withdrew his claim against him. In particular, I disagree with the majority that the plaintiff's voluntary withdrawal of his claim against Cohen—which operated as a release of liability because the statute of limitations had run on the plaintiff's claim against Cohen long before the filing of the withdrawal—does not constitute

---

[2] In their original complaint, the original plaintiffs, Leslie Aponte and Joseph Viera; see footnote 1 of the majority opinion (describing posture of parties); alleged, inter alia, that, "[b]eginning in or about November 1994 and continuously thereafter to in or about May 1995 and thereafter, the defendant, IAN COHEN, undertook the care, treatment, monitoring and supervision of the infant plaintiff's mother . . . and the infant JODEE VIERA, then in utero, for pregnancy, labor and delivery. . . .

"While under the care, treatment, monitoring and supervision of the defendant, IAN COHEN, the infant plaintiff . . . suffered serious, painful and permanent injuries . . . .

"The injuries . . . were caused by the failure of the defendant, IAN COHEN, to exercise that degree of care and skill ordinarily and customarily used by physicians specializing in the field of obstetrics under all of the circumstances . . . in that he . . .

"failed to adequately and properly care for and treat the mother of the infant plaintiff during labor and delivery . . .

"failed to adequately and properly observe and monitor the mother of the infant plaintiff during labor and delivery . . .

"failed to recognize and properly treat the infant plaintiff and her mother for arrested descent . . .

"failed to properly recognize, treat and diagnose a cephalo-pelvic disproportionment . . .

"used excessive traction and/or force during the delivery of the infant plaintiff . . .

"failed to deliver the infant plaintiff by cesarean section . . .

"delayed delivery of the infant plaintiff by cesarean section beyond the point of ability to do so safely . . .

"failed to adequately consider all intrapartum and labor factors concerning the probability of shoulder dystocia . . .

"failed to anticipate or plan for a shoulder dystocia . . .

"failed to timely consult with other specialists in the field of obstetrics; and . . .

"failed to adequately and properly read and interpret fetal monitoring tapes."

[3] I, like the majority, refer to Fred Baker, the guardian of the estate of Jodee Viera, as the plaintiff. See footnote 1 of the majority opinion for a detailed explanation regarding the posture of the parties in the present case.

a "release, settlement or similar agreement" that triggers McNamee's right to seek apportionment against Cohen. In concluding that the withdrawal is not a "release, settlement or similar agreement" within the meaning of § 52-572h (n), the majority reaches a result that is both manifestly unfair to McNamee and fundamentally at odds with the purpose of Tort Reform I[4] and II.[5] The majority's holding is unfair because it allows the plaintiff, in his sole discretion, to bar McNamee from raising an apportionment claim against Cohen merely by withdrawing his claim against Cohen. By prohibiting McNamee from seeking apportionment against Cohen, the majority also contravenes the legislative intent underlying tort reform, namely, to abolish the common-law rule of joint and several liability and to replace it with a system based on principles of comparative fault. Because I do not believe that the legislature reasonably could have intended the result that the majority reaches, I respectfully dissent.[6]

---

[4] Public Acts 1986, No. 86-338.

[5] Public Acts 1987, No. 87-227.

[6] Although I agree with the majority's conclusion that McNamee cannot prevail on his claim that the plaintiff's withdrawal of his claim against Cohen was a "settlement" or "similar agreement" based on consideration, I am unable to join the majority in its analysis of that claim. See part I C of the majority opinion. If McNamee had established, as a matter of fact, that the plaintiff's attorney, Joshua D. Koskoff, had conditioned the withdrawal of the plaintiff's claim against Cohen on Cohen's agreement to comply with the terms of the handwritten note that Koskoff had given to Cohen's attorney, Eugene Cooney, then that agreement clearly would have constituted consideration for the withdrawal and, in turn, clearly would have been a "settlement" or "similar agreement" within the meaning of § 52-572h (n). See footnote 12 of the majority opinion (detailing text of handwritten note). A careful review of the record, however, reveals that, although McNamee's counsel adverted to the plaintiff's claim against Cohen, she did not press it at trial—for example, she did not seek to present evidence to establish the claim and did not make an offer of proof—even though she generally was aware of the existence of the alleged agreement between the plaintiff and Cohen. Contrary to the majority's contention, however, the terms of the purported agreement are not insufficient as a matter of law to constitute consideration. In support of its conclusion, the majority asserts that Cohen already was obligated by statute to abide by the conditions contained in

The majority's conclusion is based on its construction of the term "release, settlement or similar agreement" as encompassing only bilateral agreements between the parties.[7] When that language is viewed in isolation from our statutory apportionment scheme as a whole, I agree

Koskoff's note. The majority further suggests that Cohen's adherence to those conditions otherwise would not constitute adequate consideration because they did not include a payment of money. With respect to the majority's first assertion, it is incorrect that the conditions set forth in Koskoff's note "merely memorialized the plaintiff's reminder to Cohen of the rules of confidentiality to which he otherwise was obligated [under General Statutes § 52-146o] once the case against him had been withdrawn." Even if those rules of confidentiality do bar Cohen from speaking with McNamee about his role as an attending physician during the delivery of Jodee Viera—a dubious proposition in view of the fact that Cohen and McNamee were partners at the time of Jodee Viera's delivery, they both participated in the delivery and, for many years, both were defendants in this action—Koskoff's note contains a condition that has nothing to do with § 52-146o, namely, that Cooney "will endeavor to arrange a meeting with Cohen with [Koskoff] or, failing that, will answer written questions truthfully put to him by [Koskoff]." Cohen's agreement to that condition, if established, alone would be sufficient to satisfy any requirement of consideration. With respect to whether only the payment of money will suffice as consideration for purposes of a "settlement" or "similar agreement" under § 52-572h (n), to the extent that, as the plaintiff claims, consideration is a requirement at all, there is nothing in the statutory scheme to suggest that only the payment of money, and not any other type or kind of consideration, will suffice. In this regard, I agree with Justice Borden's concurring opinion. Because, however, McNamee did not press this claim at trial, the trial court did not rule on it. McNamee's failure to obtain such a ruling is fatal to his contention on appeal that he was entitled to a favorable ruling on the claim. Moreover, under such circumstances, the trial court did not abuse its discretion in denying McNamee's motions to set aside the verdict.

[7] Although the majority does not expressly say so, it is apparent, in the majority's view, that the pertinent statutory language is not plain and unambiguous within the meaning of General Statutes § 1-2z because the majority, in construing that statutory language as applied to the facts of this case, explicitly relies on extratextual evidence, including the purpose of our statutory apportionment scheme. I agree that § 1-2z is inapplicable because, as the majority acknowledges, the statutory scheme, "when read in context, is susceptible to more than one reasonable interpretation." (Internal quotation marks omitted.) In contrast to the majority, however, I believe that the more reasonable construction of the term "release, settlement or similar agreement" encompasses the plaintiff's withdrawal of his claim against Cohen.

that the majority's interpretation is perfectly reasonable. In my view, however, the majority's interpretation gives far too little weight to the purpose of our apportionment statutes, which we previously have identified as abolishing the common-law rule of joint and several liability; see, e.g., *Carlson* v. *Waterbury Hospital*, 280 Conn. 125, 141, 905 A.2d 654 (2006); so as to make "a defendant's liability to the plaintiff proportionate to the defendant's degree of fault." *Smith* v. *Greenwich*, 278 Conn. 428, 461, 899 A.2d 563 (2006).

Under § 52-572h (c), a defendant in a negligence action has a right of apportionment against any other person against whom the plaintiff seeks to recover at trial. Furthermore, under General Statutes § 52-102b, a defendant also has the right, within 120 days from the commencement of the plaintiff's action, to bring into the action any person whom the plaintiff has not named in the action but who the defendant nonetheless believes is or may be liable for a proportionate share of the plaintiff's damages.[8] Finally, under § 52-572h (f), the defendant also has a right of apportionment against any "settled or released persons" within the meaning of § 52-572h (n), which, for purposes of contribution among liable tortfeasors, identifies the category of per-

---

[8] "Section 52-102b was enacted in 1995 by No. 95-111 of the 1995 Public Acts, in order to address questions that had become apparent regarding how, procedurally, to implement the concept of proportional liability [*when*] *the plaintiff in a tort action had not brought an action against all the potential tortfeasors and the original defendant sought to apportion liability and, therefore, damages, among those other potential tortfeasors.* . . .

"[Section] 52-102b provides that, if a defendant in a tort action believes that another person [not named in the plaintiff's complaint] is or may be liable for a proportionate share of the plaintiff's damages, the defendant may serve an apportionment writ, summons and complaint on that other person and seek the relief of an apportionment of liability. This apportionment complaint must be filed within 120 days of the return day of the underlying tort complaint." (Emphasis added.) *Lostritto* v. *Community Action Agency of New Haven, Inc.*, 269 Conn. 10, 42, 848 A.2d 418 (2004) (*Borden, J.,* concurring and dissenting).

sons who have entered into a "release, settlement or similar agreement" with the plaintiff, irrespective of whether any such person previously has been named by the plaintiff as a defendant. See General Statutes § 52-102b (c) (defendant not required to file notice of intent to seek apportionment against released or settled person who formerly was party to action but must file notice of intent to seek apportionment against settled or released person who never was party). It is apparent that the legislature, in enacting these statutory provisions, sought to establish a scheme pursuant to which each tortfeasor pays *only* his proportionate share of the damages for which he is liable to the plaintiff. The means by which the legislature sought to achieve that end was to permit any defendant against whom the plaintiff seeks to recover at trial the right to have the finder of fact apportion damages among any and all other alleged tortfeasors.

Under the majority's construction of § 52-572h, however, a defendant is barred from seeking apportionment against a person who, like Cohen, was named as a defendant by the plaintiff but, after the expiration of the 120 day period for filing an apportionment complaint under § 52-102b, has all claims against him withdrawn by the plaintiff. Under the interpretation that the majority adopts, the defendant is barred from seeking apportionment in those circumstances because there is no mechanism to do so. Thus, in the present case, McNamee could not have filed an apportionment complaint against Cohen while Cohen was still a defendant because § 52-102b applies only to nonparties. See footnote 8 of this opinion. McNamee could not file an apportionment complaint against Cohen after the plaintiff had released Cohen from liability because the 120 day limitation period of § 52-102b had expired several years earlier. Finally, McNamee otherwise could not seek apportionment against Cohen because, according to the

majority, a withdrawal is not a "release, settlement or similar agreement" for purposes of our apportionment scheme, even though the plaintiff's withdrawal of his claim against Cohen had *precisely* the same effect as a settlement or release inasmuch as the plaintiff's withdrawal occurred after the statute of limitations had run on his claim against Cohen. In other words, the majority concludes that, under the scheme that the legislature devised for implementing proportionality, McNamee had an absolute right to seek apportionment against any person who the plaintiff *left out of the action* but did not have the same right to seek apportionment against those whom the plaintiff *himself* alleged *in the action* were responsible for the claimed injuries.

This result is patently illogical because the persons whom the plaintiff named in the action are the very persons against whom McNamee most likely would wish to exercise his right of apportionment. Under the majority's interpretation of the statutory scheme, however, a plaintiff, in his sole discretion, may deprive a defendant of the right of apportionment against any and all such persons simply by filing an action against them, waiting 120 days, and then withdrawing his claims against them. It is obvious that, in engaging in such a strategy, the plaintiff can deprive the defendant altogether of his apportionment rights. I do not believe that the legislature would have taken the steps that it had to abolish joint and several liability in favor of proportional liability, on the one hand, and then create a loophole that empowers any plaintiff to return to the former by depriving the defendant of any opportunity to invoke the latter, on the other.

In attempting to construct a rationale for its holding, the majority asserts that its statutory interpretation "is consistent with the legislative policies that § 52-572h was designed to implement, specifically, that the plaintiff be fully compensated and defendants pay their fair

share, but, that when those rights conflict, the plaintiff's interests will prevail." In support of its assertion, the majority cites to General Statutes § 52-102b (c), which provides in relevant part that "[n]o person who is immune from liability shall be made an apportionment defendant nor shall such person's liability be considered for apportionment purposes pursuant to [§] 52-572h," and to § 52-572h (g), which establishes, inter alia, the right of a plaintiff in a negligence action "to reallocate damages awarded against an insolvent defendant to other parties to the action whose negligence caused the plaintiff's injuries." *Babes* v. *Bennett*, 247 Conn. 256, 271, 721 A.2d 511 (1998). Neither of these two statutory provisions, however, comes into play until *after* the defendant has been afforded the right *to seek* apportionment pursuant to §§ 52-102b and 52-572h (c). More importantly, construing the term "release, settlement or similar agreement" as encompassing a withdrawal— in particular, a withdrawal that is made after the applicable statute of limitations has run, as in the present case—creates no conflict between the rights of plaintiffs and the rights of defendants.[9]

The majority also asserts that the interpretation that McNamee advances would revive "[t]he unwanted prac-

[9] Of course, this court has recognized that, "[a]s finally enacted, [Tort Reform I] represents a complex web of interdependent concessions and bargains struck by hostile interest groups and individuals of opposing philosophical positions." *Sanzone* v. *Board of Police Commissioners*, 219 Conn. 179, 185, 592 A.2d 912 (1991). Thus, although our apportionment scheme contains provisions, like those singled out by the majority, that favor plaintiffs, there are other provisions that favor defendants. See, e.g., General Statutes § 52-102b (a) (allowing defendant to bring any nonparty into negligence action for purposes of apportioning liability); General Statutes § 52-102b (g) (providing that "[i]n no event shall any proportionate share of negligence determined pursuant to subsection [f] of section 52-572h attributable to an apportionment defendant against whom the plaintiff did not assert a claim be reallocated under subsection [g] of said section"); General Statutes § 52-572h (plaintiff who settles claim against party for substantially less than jury ultimately assigns as settled party's proportionate share of damages is precluded from recovering balance from remaining defendants).

tical effect [under Tort Reform I] . . . that plaintiffs [would be] required to pursue claims of weak liability against third parties, thereby fostering marginal and costly litigation in our courts." (Internal quotation marks omitted.) Majority opinion, p. 423, quoting *Collins* v. *Colonial Penn Ins. Co.*, 257 Conn. 718, 730, 778 A.2d 899 (2001). I disagree. Under the statutory scheme, if a plaintiff believes that a claim against a particular named defendant is worth pursuing, then the plaintiff has every right and opportunity to do so; if not, the plaintiff may withdraw the claim, knowing that any remaining defendant may pursue an apportionment claim against the released defendant. I see no difference whatsoever between that decision and the decision whether to accept a settlement, be it for $1, for $1 million or for any other monetary or nonmonetary consideration. In either case, the plaintiff must decide among competing considerations because, under our apportionment scheme, the defendant is entitled to seek apportionment against any person who has settled with the defendant. See General Statutes § 52-572h (f) (providing that fact finder shall specify "the percentage of negligence that proximately caused the injury, death or damage to property in relation to one hundred per cent, that is attributable to each party whose negligent actions were a proximate cause of the injury, death or damage to property *including settled or released persons under subsection [n] of this section*" [emphasis added]).

Furthermore, the "unwanted practical effect [under Tort Reform I]" to which the majority refers in its quote from *Collins* relates to a problem "under Tort Reform I . . . [whereby] the jury, in determining the percentage of negligence attributable to any defendant, could take into account the negligence of *any other person*, regardless of whether that person was a party to the action. Tort Reform I, however, did not provide the

plaintiff with a means of securing payment of damages unless that person was also a party." (Emphasis added; internal quotation marks omitted.) *Collins* v. *Colonial Penn Ins. Co.*, supra, 257 Conn. 730. As a result, "[the] plaintiff was required to name as defendants all persons whose actions suggested even the slightest hint of negligence. The unwanted practical effect, therefore, was that plaintiffs were required to pursue claims of weak liability against third parties, thereby fostering marginal and costly litigation in our courts." (Internal quotation marks omitted.) Id. Tort Reform II, however, addressed this problem by limiting the universe of negligent persons whom the jury could consider in apportioning damages between parties to the action, and between those who have been released or who have settled. Contrary to the majority's assertion, therefore, under Tort Reform II, the plaintiff in a negligence action has no incentive to name every person whose actions suggest the slightest hint of negligence, nor is there any possible danger that our resolution of this case, one way or the other, would revive the problem.

If, however, as the majority asserts, Tort Reform II did reflect a desire on the part of the legislature to avoid protracted litigation of weak claims, the majority fails to explain how permitting a plaintiff to withdraw an action against some but not all of the defendants,[10] many years into the proceedings, appreciably furthers a legislative policy of avoiding "marginal and costly litigation . . . ." (Internal quotation marks omitted.) More importantly, however, whatever marginal benefit arguably might flow from the majority's interpretation of our apportionment scheme cannot possibly justify the loss of the right of apportionment that those

---

[10] In such circumstances, the case still must be tried with respect to the remaining defendant or defendants.

remaining defendants stand to suffer under the majority's statutory construction.[11]

Finally, the majority asserts that its interpretation "is consistent with the intent of Tort Reform II, as expressed in Public Acts 1987, No. 87-227, which was to limit the universe of negligent persons that a finder of fact may consider in apportioning damages to only those entities that are either parties to the suit or parties who have reached a settlement agreement with the plaintiff—a clear indication that the legislature intended that § 52-572h (c) permit the plaintiff to obtain, to the maximum extent possible, complete compensation for his injuries." (Internal quotation marks omitted.) Majority opinion, p. 435, quoting *Babes* v. *Bennett*, supra, 247 Conn. 270. When viewed in proper context, however, the quote from *Babes* lends no support to the proposition for which it is cited, namely, that the plaintiff's withdrawal of its claim against Cohen was not a "release, settlement or similar agreement" for apportionment purposes.

The issue in *Babes* was whether the state, when it is sued for negligence upon its waiver of sovereign immunity under General Statutes § 52-556,[12] is immune from a reallocation of damages under § 52-572h (g) in the event that it is found liable for a proportionate share

---

[11] Moreover, as McNamee aptly maintains, even in a case in which discovery ultimately leads to a dead end as to one or more of the defendants, the plaintiff has nothing to fear from the remaining defendant's pursuit of an apportionment claim against his or her codefendant or codefendants. When, however, the withdrawal is motivated by trial strategy, as it apparently was in the present case, then the policy underlying our apportionment statutes strongly favors the right of the remaining defendant to pursue an apportionment claim.

[12] General Statutes § 52-556 provides: "Any person injured in person or property through the negligence of any state official or employee when operating a motor vehicle owned and insured by the state against personal injuries or property damage shall have a right of action against the state to recover damages for such injury."

of the plaintiff's damages and the plaintiff is unable to recover the portion of damages awarded against another defendant. See *Babes* v. *Bennett,* supra, 247 Conn. 257–59. We answered that question in the negative; id., 259; explaining that "when the legislature enacted § 52-556, it intended that the substantive rules governing negligence actions generally would apply to actions brought pursuant to § 52-556. Because, at that time, the rules of joint and several liability governed negligence actions, the state, in an action brought pursuant to § 52-556, could be held responsible for the entire amount of damages awarded, rather than simply its proportionate share of such damages . . . ." Id., 266. We further stated that "it would be illogical to allow the state to benefit from the apportionment provisions of § 52-572h (c) when there are multiple liable defendants, but not to subject the state to the reallocation provisions of § 52-572h (g) when a liable codefendant is insolvent." Id., 267.

In reaching our conclusion, we briefly summarized the history of Tort Reform, explaining that, "under Tort Reform I, [the trier of fact] in determining the percentage of damages attributable to a particular defendant . . . was able to take into account the percentage of damages attributable to any other person, even if that person was not a party to the suit. A plaintiff was unable, however, to recover complete compensation for his injuries unless every person whose negligence proximately caused the injuries was a party to the suit. The share of damages attributable to nonparties was not recoverable.

"The legislature amended § 52-572h (c) just one year later when it enacted Public Acts 1987, No. 87-227, § 3 (P.A. 87-227) [which was part of Tort Reform II]. . . . [T]he intent of P.A. 87-227 was to limit the universe of negligent persons that a finder of fact may consider in apportioning damages to only those entities that are

either parties to the suit or parties who have reached a settlement with the plaintiff—a clear indication that the legislature intended that § 52-572h (c) permit the plaintiff to obtain, to the maximum extent possible, complete compensation for his injuries." Id., 269–70.

It is apparent, therefore, that the passage from *Babes* on which the majority relies simply refers to the same problem that was addressed in the passage from *Collins* on which the majority also relies, namely, that, under Tort Reform I, a plaintiff often was unable to obtain complete compensation because of language in Tort Reform I that permitted the fact finder, in determining the percentage of negligence attributable to the defendant, to consider the negligence of a nonparty. Thus, we explained in *Babes* that, by limiting the universe of negligent persons whom the jury could consider in apportioning damages to persons against whom the plaintiff actually *could* recover, namely, parties and "settled or released persons"; General Statutes § 52-572h (f); the legislature merely had sought to remedy that aspect of Tort Reform I that had placed defendants at an unfair advantage by preventing plaintiffs from obtaining complete compensation.

There is nothing in *Babes*, however, or in any other case, to suggest that the legislature, in enacting Tort Reform II, sought any result other than to strike an equitable balance between the interests of plaintiffs and of defendants. Under the majority's interpretation of the statutory scheme, the balance that the legislature sought to achieve has been shifted dramatically in favor of the plaintiff, who now has the ability to erect an absolute bar to apportionment. Because that cannot be what the legislature sought to accomplish, I respectfully dissent.